KOLENE CORPORATION, and Deutsche Gold-Und-Silber-Scheideanstalt Vormals Roessler, Plaintiffs,

v.

MOTOR CITY METAL TREATING, INC., Defendant.

Civ. A. No. 25283.

United States District Court
E. D. Michigan, S. D.
July 28, 1969.

Daniel G. Cullen, and Bernard J. Cantor, of Cullen, Sloman & Cantor, Detroit, Mich., for plaintiffs.

Martin J. Adelman, Birmingham, Mich., and Joseph Levin, Detroit, Mich., for defendant.

## OPINION

TALBOT SMITH, District Judge.

This case involves a process patent. The use of the process on certain metals, particularly ferrous, results in a tough and wear resistant surface, with greatly increased fatigue strength. Thus "Helicopter rotor blade dampers have service life tripled." [1] It has been described as a "new technology" and there is no doubt that the description is accurate. But this case has an unusual circumstance, new in our experience at least, of significance in some phases of the case. Although we have heard extensive oral testimony, have seen moving pictures, have examined many documents and depositions (the parties have prepared and tried the case with great care), have examined metallic pieces treated by the process, as well as much trade literature, we have yet to be told just how or why the process works as it does. The parties disagree and their experts disagree. We will examine this matter further in due course.

The parties before us are Plaintiff Kolene Corporation (hereafter Kolene), a Michigan corporation, doing business at 12890 Westwood Avenue, Detroit, Plaintiff Deutsche Gold-Und-Silber Scheideanstalt Vormals Roessler (hereafter referred to as Degussa, its trade

1. Automotive Industries, May 14, 1962. Ex. 10.

name), a corporation of the Federal Republic of Germany with offices in Frankfurt-am-Main, West Germany, both collectively referred to hereafter as the plaintiff, and Defendant Motor City Metal Treating, Inc. (hereafter Motor City), a Michigan corporation doing business at 3400 Dunn Road, Detroit.

Involved here is Claim 1 of U.S. Patent No. 3,022,204, issued February 20, 1962 on an application filed by Johannes Muller and Carl Albrecht. The patent is entitled "Process for Nitriding Metals". The plaintiffs claim that the defendant is guilty of infringement and seek an injunction and an accounting.

The defendant alleges that the patent-in-suit is invalid, due to obviousness, and moreover, that the patent is not infringed by the defendant's accused process. In addition, the defendant asserts that the patent is unenforceable and invalid because of alleged fraud on the Patent Office and misuse by the plaintiffs. Defendant also counter-claims for treble damages under the Federal Anti-Trust laws on the ground that the plaintiffs practiced a fraud on the Patent Office in securing the patent, such fraud arising from an alleged failure to advise the Patent Office of the best prior art and in making deliberate misrepresentations to the Patent Office. There is no issue as to jurisdiction of this Court, title to the patent-in-suit, or notice of infringement. There is no serious dispute that the defendant's principals and organizers had knowledge of the patent-in-suit when defendant was organized in October of 1963, when the defendant began its alleged infringing activities and, actually, at an even earlier date, that is, when they were associated with another company, Commercial Steel Treating, prior to mid-1963, and shortly after the issuance of the patent in February of 1962.

Prior to the issuance of the patent-in-suit there was extensive metal-treating history relating to what is called "nitriding". This term, broadly speaking, refers to the casehardening of a piece of metal by the use of nitrogen.[2] The prior art background of the heat treating of metals begins with gas and liquid nitriding processes.[3] The use of these processes was unrestricted to certain of the ferrous alloys since they were not usable on all ferrous materials, such as cast iron. The gas and liquid processes were lengthy and expensive, the former (subjecting the piece to a high temperature nitrogen gas atmosphere) being used particularly for parts where high cost was not a factor, such as in selected governmental and aircraft operations. In the liquid nitriding processes (such as Chapmanizing, which involved heating in the range of 1550 to 1600°F, Malcomizing, Kaliding, and others) the part was immersed in a high temperature molten cyanide bath for prolonged periods of time.

To those skilled in the art the term nitriding was synonymous with marked disadvantages. It did, it is true, result in a wear-resistant surface on some ferrous metals but at the cost of brittleness, lengthy treatment, and high costs. In addition, there was the problem of distortion in the processing. Mr. Michael Soviak, the Chief Metallurgist at Commercial Steel Heating Corporation, testified by deposition and referred in part to the difficulties involved due to the high temperatures used. " * * * We had a tremendous problem with this thing, using carbo-nitriding and cyanide treatments of all kinds where we had to heat to a high temperature and quench. * * "

---

2. " * * * a process of casehardening steel by impregnating with nitrogen * * * " Webster's Third New International Dictionary, 1961.

3. Dr. Muller's article in Das Industrieblatt, Stuttgard, September, 1954, "Nitriding Steel in the Salt Bath" contains a descriptive comment, in referring to the use of ammonia as the nitriding agent, of the mechanism of the nitrogen penetration into steel. "The atomic nitrogen which is formed in this decomposition process is extremely reactive before it recombines to form a nitrogen molecule $N_2$,—it is able to penetrate the steel surface and to diffuse into the steel."

And at a later point, "One of the biggest headaches in our business in distortion. We carry a battery of straighteners that are expensive and their job is to straighten things that distort." In addition, of course, the original dimensions of the piece had to take into account the machining and grinding required to correct the distortion resulting from the process. Under these circumstances there was a real need for a commercially feasible, non-distorting process that would impart to ferrous materials both wear resistance and fatigue resistance and at the same time maintain ductility, thus avoiding brittleness. It should, as well, be economically feasible.

In approximately 1954 Dr. Johannes Muller, a Chemist and Metallurgist who was employed by plaintiff Degussa, developed a "soft" nitriding process which anteceded the patented process we here consider. "Soft" nitriding [4] involved using a salt bath as the nitriding medium. The active ingredients were sodium cyanide or potassium cyanide or mixtures of both. Dr. Muller states (Ex. B) that the nitriding effect of sodium or potassium cyanide was the result, for example, of the oxidation of sodium cyanide to sodium cyanate. In the decomposition of the latter, nitrogen appeared in the nascent state and could penetrate steel. There was thus obtained a thin, ductile, and tough "compound" layer formed of non-brittle, ductile iron-nitrides, beneath which layer a deeper nitrogen diffusion zone was found. The process was a relatively short one, requiring about 90 minutes, resulting in both increased wear and fatigue resistance, and without the sacrifice of ductility. Moreover, due to the operating temperature of approximately 1050°F there was no significant distortion. These findings of Dr. Muller were reported in articles published in Germany, which articles form part of the prior art in this suit. We will refer to this process hereafter as the "non-aerated" process in order to distinguish it from the aerated process before us in the patent-in-suit.

Promising though it seemed in the laboratory, however, and in use on a small scale, it had one serious drawback. The results were not uniform. Commercially applied, the process was erratic to the degree that variations were not only found from batch to batch, but within parts in a single batch. Similar variations were found in both fatigue and wear resistance. Dr. Muller, himself, spoke of the experience of Volkswagen, "They found one day 50 per cent [reference is here made to per cent of improvement in the fatigue properties]; another 70 per cent; another 20. So that describes the situation." As a result "They decided to not continue the tests or to introduce a process into the production or to approve it for production." Daimler-Benz "stopped all the test work after a certain while, * * * because of not reproducible results." In fact, Dr. Muller himself when asked whether he or his company ever used a non-aerated cyanide-cyanate bath in commercial processing answered, "I would say not really", and went on to explain "because the results I got from this non-aerated bath were not consistent enough, so it was not possible to, let's say, enlarge the use in this field." When asked whether anyone used such a bath commercially in the commercial processing of workpieces, he replied that one company did (Braunschweig) but that "they threw it away after a certain while." This process, we find, was a commercial failure.

We now reach the gist of the patent. We have noted that the simple immersion of the metal in the chemicals, "soft" nitriding, although it resulted in the marked advantages described, was commercially unusable because of its fatal defects as to inconsistency and lack of uni-

---

4. The term arose, we are told, "because previous gas nitriding was brittle, and the opposite to brittleness was soft in the German language, I understand, so they called it 'soft nitriding'." It was a contradiction in terms in the metallurgical world since nitriding theretofore meant hardness and brittleness.

formity. This was particularly harmful to its employment in large volume production. In 1959 one Carl Albrecht, collaborating with Dr. Muller, decided to experiment with the theretofore relatively quiescent bath by adding another step, namely, that of air-bubbling. Sub-surface air was introduced into the vessel and allowed to bubble through the mixture. The results, for some reason, were not only uniformity, consistency, and large-volume reliability, but an increase in the favorable attributes (e. g. ductility) obtained from the commercially unsuccessful non-aerated salt bath. As we have noted heretofore, just why this is true no one seems to know. Counsel for both parties presented theories, as did various experts. Plaintiff's counsel thought that if aeration oxidizes cyanide (as usually contended) it does so by forming a nascent cyanate in situ. This, of course, would be in addition to the already present cyanate. Dr. Muller, the patentee, theorized that when aeration forms a nascent cyanate in situ, the bath in effect contains two forms of cyanate, a normal cyanate and an iso-cyanate. But Dr. Muller does not tell us why this reaction caused both qualitative improvement and uniformity of results. Expert witness Kates, the Director of Metallurgy for the Lindberg Steel Treating Company, admitted that " * * * I don't know the cause of the chemical thermodynamics involved but there is—the addition of air creates a catalytic effect to allow for the greater diffusion of the nitride that is formed." (Whenever an expert speaks of some sort of "catalytic" action it is merely another way of saying that an unknown factor is at work.) Expert witness Arne Mars, employed by Vickers, Inc., a division of Sperry-Rand, as Manager, Metallurgy Research and Development (this company, we note, not only has manufacturing plants within the United States but plants in Australia, Japan, Germany, England, and under construction in India and Brazil), in response to the question "Do you feel that the air oxidizes cyanide to cyanate?", "I don't know for sure exactly if it does do

that in a replenishing type of reaction which you are talking about, but there are chemical reactions that are going on, and exactly what happens, I really don't know."

From the testimony presented in Court and a review of the depositions, articles, and exhibits, the Court is satisfied that although no one can tell us precisely in what manner aeration operates to produce consistent and uniform results, together with a substantial qualitative improvement, it does do so. It is clear that when the air supply is shut off, either by mishap or deliberately, the process no longer works in the sense that it no longer produces uniform, consistent, and acceptable results. Again referring to the testimony of Mr. Mars of Vickers: "We've had some problems with no aeration. For instance, when our sparging ring [which introduces the air] would plug up or something and we had a lot of problems, parts were scrapped." He goes on "And without the air we just didn't get the compound layer on there." Referring to the effect of aeration, Mr. Mars referred to some tests that they had run: "This is something that we previously had done in our R and D type work, just to run a bath without air to see what happens, so when we run into a production problem we can recognize it". Question: "And you found then that without the air it did not work?" Answer: "That's right."

■ It is our judgment that aeration (meaning, in this context, sub-surface air introduction) is the gist of the invented process before us. It is well to stress at this point that the accused patent-in-suit, is a "Process for Nitriding Metals" and that what has been patented is a process or art. The important thing is a method of procedure, not the particular means by which the method is practiced, Expanded Metal Co. v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034 (1909) or the apparatus used in carrying it out.

So far we have emphasized the operations of Degussa and the work of the chemical experts. The way Kolene got

into this matter is this: Its business is the chemical process business. The company sells the equipment and salts used in various industrial molten salt bath processes. These include rescaling stainless steels, exotic metals and alloys, degraphatizing and desanding cast iron, and the stripping of paints and plastics from industrial components. It deals with nearly all of the major industrial plants in the United States as well as plants overseas.

In 1958 John H. Shoemaker, the President of Kolene, visited Degussa, which was one of its licensees in Frankfurt, Germany. At that time he was told of the then new (and later unsuccessful) "soft" nitriding process which had been developed at Degussa. The test specimens shown him were from the earlier "soft" nitriding process which did not involve the bubbling of air through the mixture. When Mr. Shoemaker returned to this country he endeavored to sell the process in the United States but was received with much skepticism and some ridicule because the term "soft" nitriding was contrary to the then accepted understanding of metallurgists that nitriding produced hardness, not softness. There was little interest shown in the process.

In the summer of 1959, however, Mr. Shoemaker returned to Germany with Mr. George Bidigare. Mr. Shoemaker, who was not himself a metallurgist, desired the advice and the evaluation of an expert in the field and hence made an arrangement with Mr. Miel, at that time the President of Commercial Steel Treating of Detroit, to take with him Mr. George Bidigare, who was a highly skilled, experienced metallurgist in Commercial's employ. After some reluctance, Degussa agreed to disclose its process to Mr. Bidigare upon Mr. Shoemaker's representations that he required Mr. Bidigare's technical advice, and the process was disclosed to both gentlemen in confidence. They spent some three weeks with Degussa receiving information and dictating detailed reports, for by this time Degussa had the aerated process, it

having been conceived and introduced at Degussa in February of 1959. This was the first time Mr. Bidigare had ever seen or heard of such a process and it was his opinion that the process was new and different from anything he had known before. It was at this time, during the 1959 visit to Degussa, that Mr. Shoemaker coined the trade name "Tufftride". A new and more descriptive name was sought because of the resistance that metallurgists in the United States had exhibited to the term "soft" nitriding. The trade name refers only to aerated processes and has been used commercially by Kolene only to describe such process. The Court does not view the appearance of this word, from time to time in memoranda and files, and its use by translators in translating documents from German to English, to refer to the earlier non-aerated "soft" nitriding process as significant. We find that the trademark "Tufftride" was coined and formulated by Mr. Shoemaker, was intended to refer only to the aerated process (and not the earlier unsuccessful non-aerated process) and does commercially refer only to such aerated process which was introduced to the United States by Mr. Shoemaker. Incidentally, it is clear that the non-aerated process was never introduced into the United States. (Where the word "Tenifer" is found, it may be recognized as the trademark used in Germany by Degussa for the successful aerated high-cyanate process.)

The process-in-suit was introduced into the United States in 1959 and has been widely adopted and widely used. This, however, took considerable time and effort on the part of plaintiff Kolene and its various franchisees since as we have heretofore noted, the term "soft-nitriding" was contrary to the normal knowledge of the art and the understanding of experts in the field respecting the effect of nitriding on ferrous metals. The skepticism, however, and resistance, were overcome by the use of the process. International Harvester, for example, had been experiencing difficulty with its

crankshafts which were breaking after being used from 100 to 150 hours. They tried this technique as the last straw, and found that "After the Tufftriding process, we ran 5000 hours." The process has now been adopted by many major industries in the United States and in foreign countries. Trade publications speaking favorably of the process are numerous and will be found in Exhibit 10. Some quotations therefrom will be found in the footnotes.[5] The materials from the publications are so voluminous that we will simply say that the record is replete with instances where the lives of all types of industrial parts such as dies, intricate stampings, automotive and engine parts, gears, as well as other pieces, have been substantially increased, and substantially improved by treatment with the process-in-suit.

The invention disclosed in the patent-in-suit, in more detail, relates to the process of aerating a cyanide-cyanate salt bath for the treating of metal parts. The application was filed on March 20, 1961[6] and patent issued in 1962. Messrs. Miel and Bidigare, both with defendant Motor City, thereupon sought the advice of counsel upon how best to avoid the patent. Their background and interest was this: Mr. Miel was President of Commercial Steel Treating Corporation until 1963

and thereafter became one of the organizers and the controlling stockholder of defendant Motor City. In 1959 Mr. Miel and Commercial had cooperated with Kolene in introducing the Tufftride process into the United States, afterwards splitting from Kolene. After 1963 (after Mr. Miel had left) Commercial became a franchisee. Mr. Bidigare, whom we have mentioned heretofore, also left Commercial in 1963 and was also one of the organizers of Motor City, serving as its President until 1964.

As we have noted, after learning of the process with Mr. Shoemaker, at the Degussa plant, Mr. Bidigare had set up and operated at Commercial a Tufftride installation. Afterwards, in 1960, the split between Commercial and Kolene took place. Miel and Commercial, however, continued to use the aerated process. They assert that they are using a different process, which brings us to the matter of infringement.

As to the desired avoidance of the patent-in-suit, Messrs. Miel and Bidigare made certain changes in the process and equipment used therewith. Since the patent claims specified that the process employed "between about 25 to 40% cyanate" they decided to use 50%. This introduced no functional change in the

---

5. Ex. 10, Tab 7, Tool & Manufacturing Engineer, April, 1964:
   "Many parts now made of more expensive alloy steel can be made of low carbon steel and then processed to achieve desired level of engineering properties."
   (p. 3) "In addition, the use of the process occasionally offers the only acceptable engineering solution to a part's performance problem."
   Ex. 10, Tab 9, Machinery, March, 1965:
   "An economical nitriding treatment eliminates spalling and decreases soldering of die casting dies."
   "Greatly improved operation of die casting dies has been observed by nitriding them with a low temperature, short-cycle process called Tufftriding."
   Ex. 10, Tab 10, Hot Rod, March, 1965:
   (p. 32) "The forged steel crank, having undergone the Tufftride process, is one of the Chevy bottom end highlights."

(Referring to new Chevrolet engine).
Ex. 10, Tab 11, Iron Age, July 5, 1962:
Describing an automated TUFFTRIDE system set up to treat crankshafts:
   "Why did they automate Tufftriding? An unusual crankshaft design was needed for the new Willys Motors heavy duty Toronado-OHC engine. Willys wanted a tough crankshaft with the right proportions and finish to assure good bearing life."
   "This made possible a lighter and simpler shaft. It also gave high mechanical efficiency to the heat treated parts."
   "Machined from SAE 1045 steel forgings, the crankshafts promise higher reliability at lower costs."

6. This was based on earlier patent applications U. S. Serial No. 17,541 filed March 25, 1960 and U. S. Serial No. 40,555 filed July 5, 1960.

process, but was described by Mr. Graf-miller, a graduate metallurgist, formerly with Commercial, later one of the organizers and President of Motor City, in these terms:

"Q: Do you know of any difference whatever in the functioning of a bath that has a cyanate content of 50 or more as contrasted with a bath which has a cyanate content of 25 to 40?

A: Again, I have not been in this long enough to say yes or no to that. But to my knowledge it doesn't make any difference.

Q: It is simply a question of avoiding the patent?

A: Right."

Mr. Miel was somewhat more guarded. Avoidance of the patent was only part of the reason for going to a 50% cyanate level. The only other changes made were equally non-functional, namely, the use of an L-shaped tube (instead of a ring) to introduce the air into the bath, and (about this same time) using a titanium liner for the bath. (Stainless steel has also been employed for liners.) But it is noteworthy that the process of aeration, which was the key distinguishing feature between the old commercially unsuccessful German process, and the present successful one under the Muller-Albrecht patent, was not disturbed.

The claims-in-suit for the process were in part,

"A process comprising immersing a metal workpiece in a molten alkali metal salt bath comprising between *about 25 to 40% cyanate*, at least about 40% cyanide * * *" Col. 8, lines 48–50, Patent-in-suit.

Our italicized words indicate the core of the controversy. The defendant claims that it uses between 48 to 50% cyanate and thus does not infringe. The first question that arises concerns the reasons for defendant's increase in cyanate. It sometimes happens in chemical processes that at a certain point in the reaction, a marked or significant change takes place. The reactions may stabilize on a certain plateau, that is, at a certain level. Or, having theretofore maintained a certain level, they may with changed conditions or concentrations, show a rise, or possibly a decrease, in intensity. Nothing of the sort occurs here. The "about 40%" is not critical from an operating point of view. Nothing happens at this point. It is clear from the testimony that this "about" 40% figure had its origin in the fact that the salts were eating up (reacting with) the then-available iron pots, producing a sludge. Its removal was difficult and laborious, since it was a shovel operation with highly poisonous chemicals, (the lethal effect of the cyanides is well known) heated up to over a thousand degrees Fahrenheit. The "about 40%" was not a critical limitation of the inventive concept. At about 40% the effects upon the pot were so marked as to be incompatible with an economical and efficient commercial operation. As a matter of law, the term "about" is a clear warning that exactitude is not claimed but rather a contemplated variation. Thus the words "between about 25 to 40%" of claim 1 described limits ranging from a chemically operative lower limit (the 25% figure, as shown from the charts and testimony, is approximately where the effects of the bath begin consistently to increase) to a commercially imposed (for economic reasons) upper limit. It was the then best known method for operating the process.

While we are on this topic of operating the process, it would be well to keep in mind that what we are concerned with here is a process invention. It includes certain acts or steps in combination, simultaneously acting on the salt bath and the metal pieces therein, namely, immersing the workpiece in the described liquid solution, and next, aerating the whole mixture, workpieces and all, by bubbling air upwardly through the mixture from below. The specific details of the apparatus are of little or no significance or relevance. The pot is not the claim, but merely the vessel in which it all takes place. Nor is the pipe introducing the air the claim, whether a ring with holes

in it, or an L-shaped pipe or what not. What we are concerned with here is a patent claim for a process as a whole and so we consider it. See, Minnesota Mining v. Kent Industries, 409 F.2d 99 (CA 6 1969).

■ Except for the asserted difference in the cyanate content to 48–50%, the process used by Motor City is substantially the same as that taught by Degussa to Mr. Bidigare. Both Mr. Bidigare and Mr. Grafmiller testified that (in comparing the process when operated at 40% cyanate with that employing 50% cyanate) the purpose of the process was the same, the operations were the same, the results the same, and, more revealingly, Motor City's customers were advised that the results of the Tufftride process and defendant's accused process were essentially the same. "Equivalent to or superior to" were Mr. Bidigare's words to Chevrolet and to the trade in general. In fact, orders from General Motors, Chevrolet Division, and from Firestone Steel, Division of Firestone Tire and Rubber,[7] to Motor City, specifying Tufftriding were received in evidence as bearing on the point that customers treated the accused process as the full equivalent of the Tufftride process and that Motor City was "riding along" (counsel's expression) on the trademark "Tufftride". So far as equivalence is concerned, the defendant is hardly in a position to deny it since it is clear that they have traded on the Tufftride name and reputation in soliciting business for its accused process.

■ The defendant's position respecting non-infringement rests upon the literal difference, if any, between the 48 to 50% cyanate allegedly used by the defendant and the words of the claims-in-suit "between about 25 to 40% cyanate". Shortly stated defendant says that a "between about 25 to 40%" cyanate does not "literally read" upon 40 to 50% cyanate and therefore there is no infringement.

But the difference is colorable, merely. There is no substantial or material difference. There is in fact literal readability, if proper weight is given to the qualifying word "about". Moreover the accused process is the full equivalent of the process defined in Claim 1 under the doctrine of equivalents, Graver Tank & Mfg. Co. v. Linde, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

■ But defendant asserts that plaintiffs are estopped by a so-called File Wrapper Estoppel from construing the words "between about 25 to 40%" cyanate to include defendant's 48 to 50% cyanate. We will consider the entire File Wrapper disclosures and reliances at this point as they bear upon the several aspects of the case.

The original claims 1 and 2 in Patent Application U. S. Serial No. 17,541, filed March 25, 1960, described only the concept of bubbling air through the mix, that is, aeration and nothing more. "According to the invention it was unexpectedly found that the nitriding action of such baths could be materially improved by passing finely divided air or other similar oxidizing gases therethrough * * * *"[8]

These claims were rejected on the grounds (see pp. 18 and 19 of the bundle) that the specifications did not indicate how the formula for the amount of oxidizing gas was derived, and that nitriding by nitrogen was the equivalent of what applicant was accomplishing by oxidizing, and that a British patent showed the "bubbling of the nitrogen containing gas" into a salt bath for nitriding. But it is significant, at this point, to note that the Examiner did not reject on the basis that the prior art showed a process over which applicant distinguished solely on the matter of the maximum level of cyanate, which is the bone of contention at this point. Had he done so, a substantial question might arise, but such was not the case.

---

7. E. g., Purchase Order, 2–22–65, Firestone to Motor City Metal Treating Corporation, "Services to *Tufftride* Chevrolet Flexplate Part #RA 26821–2" [Emphasis the Court's]

8. Page 2, Application 17,541.

The insertion of the phrase "between about 25% and 40%" which later came into the case was hence not dictated in attempting to distinguish over any earlier aerated cyanide-cyanate process but was inserted because substituted attorneys [9] felt that it was improper under United States patent practice not to clearly define an operative process, stating an operative range, rather than merely describing the naked concept of adding aeration to some (or any) cyanide-cyanate baths. As we have seen, there was an approximate lower limit, for chemical reasons, of 25% cyanate, and an approximate upper limit, for commercial reasons, of 40% cyanate. Thus, there was no giving up of any operative claim and the substitution therefor of another. No prior art required the cancellation of such claims, since no prior art cited by the Examiner (or, in fact, by the defendant here) included aeration in combination with cyanide and high cyanate. The Court, therefore, concludes and finds that the cancellation of the original, non-operative, no-range claims, when viewed in context, was not caused by a need to avoid any area of prior art which plaintiff here seeks to recapture, but rather was a surrender only of inoperative naked claims, monopolizing every level of cyanate content, from the excessively low to the excessively high. Plaintiff is not here asking the Court to add an unclaimed element, which was once claimed and then abandoned in order to save the claim from invalidity due to the prior art,[10] or to drop from the claim some limitation originally added to distinguish the claim from the prior art cited by the Patent Office. There is, we find, no surrender or estoppel barring plaintiff from asserting infringement against cyanate percentages over 40%. This "surrender" point is the first of defendant's two theories of file wrapper estoppel.

▇▇ But defendant also argues that plaintiff's file wrapper statements, which allegedly argue that 25–40% is a critical level of the cyanate content of the process bar plaintiff from bringing infringement against the same process when operated over 40% cyanate. The defendant urges to us that while plaintiffs knew that the cyanate content was not critical to the operation of the process, they repeatedly took the position before the Examiner that the cyanate range was critical.

This is an area calling for the greatest care in the interpretation of single sentences isolated from not only what preceded and followed the text, but from the case as a whole. We have seen heretofore that approximate ranges of operation with cyanate were imposed by a) the chemistry of the process (this is at about 25% cyanate) and b) the commercialization of the process (this was about 40%, due to the then-existing sludge problem). To this extent there is a critical range, "between about 25–40%". But (and we are looking particularly at the higher level, because this is where defendant operates) there is nothing whatever in the file wrapper, or the evidence before us to support a conclusion that the upper limit was critical to one exact percentage. "About 40" was good enough. This reflected merely the then operating experience. Whether 48, where defendant allegedly operates (48–50), was equivalent to 40 is nowhere negated by the file wrapper. Actually, that question is determined by the functioning of the process with the available impedimenta. Speaking of functioning, it is significant that defendant has failed to show that the functioning of the process at 48 is any different from that at 40, and we have heretofore commented that no performance or reaction curve presented to us shows any significant break at 40. We will not prolong this opinion with ex-

---

9. There is some argument whether the original attorneys were German attorneys or American but we do not find it particularly helpful to resolve the issue.

10. See, Kaiser Co. v. McLouth Steel Corp., 400 F.2d 36 (CA 6 1968).

cerpts and testimonial references to the file wrapper [11] but we are satisfied that the plaintiff did not critically limit itself to a maximum of 40% during Patent Office proceedings.

█ It is our conclusion as to infringement that the accused process is identical in all material respects to the process defined in Claim 1, the slight increase in the cyanate employed by defendant being immaterial. The accused process performs an identical function, and is identical in purpose and operation. Its results, as well, are substantially identical. Moreover, so far as equivalence may be involved, we find specifically that the accused process is the full equivalent of the process defined in Claim 2 in all material respects, and is an infringement thereof.

█ We turn next to the defense of obviousness, novelty having been admitted. In this area our first inquiry must be as to the scope and content of the prior art. The best and most obvious prior art, of course, was the German nonaerated cyanide-high cyanate process we have heretofore discussed, along with the Volkswagen and other experience. Despite its initial high promise, it was unsuccessful. This earlier process was clearly presented to and considered by the Patent Office Examiner. Thus we find on the very first page of the patent application file wrapper that "The nitriding of steel workpieces by treatment in a fused salt bath containing alkali metal cyanide and alkali metal cyanate at temperatures between 500–600°C already is well known." Other comparisons are found between the earlier nonaerated process and the aerated process-in-suit, with the result of the Examiner's finding that the aerated process was patentable. Other prior art (note the Webster Dictionary definition found in footnote 2 hereto) were the old gas and liquid nitriding processes. None employed the

gist of this invention, aeration. They were usable on only certain types of ferrous materials, not all, they had pronounced disadvantages, and none provided a ductile (yet hard surfaced) workpiece. The process-in-suit was considered contrary to the established knowledge of those skilled in the art, as to purposes, functions, operations and results of the prior known nitriding processes. The essential difference was the addition of aeration. The results, at first received with skepticism, even by those skilled in the art, were as we have pointed out heretofore, subsequently referred to as "unheard of in the metallurgical field",[12] and as "probably the biggest breakthrough in the heat treating field for several generations."[13]

Our ultimate question on this phase of the case is whether the addition of aeration (which is the essential difference between the claimed process and the prior art) was obvious to those skilled in the art. Persuasive in this regard is the established fact that the experts differ on just what sub-surface aeration does and why. It just happens, that's all. No prior art suggested adding aeration for uniformity of results and qualitative improvement over the earlier non-aerated bath. Such an unexplainable happening can hardly be said to be obvious to anyone.

Defendant argues that the principal result of aeration is merely to add cyanate (by oxidizing cyanide), thus replenishing used cyanate. But there is no proof of this, and it is significant to us that defendant, while maintaining its high level of cyanate by adding bricks of pure cyanate, nevertheless continues to employ aeration. The reason is clear. It is because without aeration the process is commercially useless. We find, on the record before us, that aeration does more than merely to add cyanate, but just exactly what it does we have not been told

11. This is Exhibit O. See, also, patent-in-suit, Ex. 1, col. 2, lines 39–40.

12. Metallurgist Soviak, Commercial Steel Treating Corporation. Tr. 626.

13. Metallurgist Mars, Vickers Corporation. Tr. 645.

and cannot say. Our conclusion, based upon the criteria set forth in Graham v. John-Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) is that the defendant has not maintained its burden of proof as to obviousness. The Court, rather, finds that the process defined by Claim 1 was not obvious to those skilled in the art at the time the invention was made.

Defendant also contends that a fraud was practiced on the Patent Office. Defendant offered no proofs on this serious charge save introducing the File Wrapper into evidence. In the *Pfizer* case,[14] upon which defendant heavily relies, the Patent Office Examiner was called and testified that he was in truth misled by the concealment of evidence which he had requested and which evidence was available and known to the patentee. Of course, this is not the only way, as defendant properly argues, of proving such fraud but in a case of this magnitude on an issue so important, involving, as it does, the penalties involved in anti-trust violations, we would desire something more decisive than the dry contents of the Wrapper. However, we will work with what we have.

Briefly, the patent application followed a not unusual path in the Patent Office.[15] There was an initial rejection of claims based upon a British patent[16] and an earlier Muller patent.[17] Applicant's responses contrasted the claimed process with both of these references. The material and significant ones of the rejected claims were replaced by Claim 12, renumbered as Claim 1-in-suit. Such claim was directed to a process employing (a) cyanide (b) high cyanate and (c) aeration, together with other specifications. This claim (with others) was ultimately accepted by the Patent Office and the patent-in-suit issued.

The gist of the fraud charge is the allegation, repeated with many variations, that the Examiner "did not have before him the best prior art, 'soft nitriding'." We find, on the contrary, and beyond reasonable contradiction, that the Examiner was fully informed thereof, that the applicants acknowledged the old unsuccessful German process as part of the prior art, but urged that its aeration in a cyanide-high cyanate bath was the distinctive and novel element of the process claimed. Thus on pages 1 and 2 of the Patent Application, No. 17,541, Ex. O, after referring to the older, well-known nitriding by treatment in a fused salt bath, it was stated that "It was found, however, that the nitriding action of such baths is not always uniform and that quite often defective results were obtained", and, continuing:

"According to the invention it was unexpectedly found that the *nitriding action of such* baths could be materially improved by *passing finely divided air* or other similar oxidizing gases therethrough and that when this measure is taken the nitriding action of the baths is no longer dependent upon the depth of the baths.

"The beneficial effect achieved by introduction of finely divided air into the fused salt bath is, for example, exemplified in that a fused salt bath 60 cm in diameter * * *" [p. 2, Italics the Court's]

Later (p. 80) it is also pointed out that

"The *aeration of the fused salt bath* during the nitriding operation to a certain extend controls the nitriding action obtained. In general for reasons of economy the nitriding action is increased to its highest possible value." [p. 8, Italics the Court's]

* * * * * *

"The air or oxidizing gas is introduced into the bottom of the fused salt bath in such a way that it is finely distributed in the form of small bubbles which rise up through the molten bath." [p. 8]

14. Chas. Pfizer v. Federal Trade Commission, 401 F.2d 574 (CA 6, 1968).

15. See Ex. O. Patent Application.

16. No. 591,793, August 28, 1947.

17. No. 2,927,875, March 8, 1960.

We note also (pp. 13–16, Application) that the process claims as filed specified aeration as an essential element.

The curves in the File Wrapper (p. 28) labelled as "unaerated" and "aerated", graphically demonstrate the differences between the old unsuccessful process and the new one. "The differences between treatments of the same metal under the same conditions and in the same bath is even more pronounced when the bath has been *aerated* during the treatment of the metal as compared to the *same bath in which no air was added.*" (p. 27) [Emphasis the Court's]

■ The record is replete with further instances of notifications, together with comparisons. We find that, starting with the first page of the application, and continuing throughout, there were ample references to alert the Examiner to the old process. The law in this area seems clear. Where an applicant deliberately and intentionally, rather than unintentionaly or mistakenly, suppresses material evidence or gives the Examiner false and misleading evidence, which betray him into granting a patent that he might not otherwise have granted, the patent is not only unenforceable, but the fraud so practiced might ground an anti-trust claim, should the other elements of an anti-trust violation be proven. Walker Process Equipment Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

Further charges of fraud are levelled with respect to technical papers and brochures, test samples and test reports describing the results obtained by the use of the old German non-aerated process, and an affidavit by Mr. Shoemaker, President of Kolene, all of which are found in the file wrapper. It is said that these were fraudulent misrepresentations to the Patent Office since those representations involved in the charge related to the old German process. It is true that much of the soft nitriding data obtained from the older, one-step process was used but it was equally applicable to the new aerated process-in-claim. As we have pointed out heretofore, the old process did indeed have marked advantages, combined with its disastrous disadvantages, and it was the claim of the applicants that the new bubbling process largely eliminated the disadvantages. The use of the old process data was completely proper (indeed, we would say, essential) provided only, and here is when the charges of fraud collapse, provided the Examiner was informed of the relation of the old process to the new. This he was, as we have shown.

■ The burden of proof of fraud upon the Patent Office, whether relating to the defense of fraud or to the anti-trust counterclaim based on fraud is upon the defendant and it has not been sustained. There is no showing that any statements to the Examiner by applicants were materially untrue or misleading, or that any representations had a tendency to (or did, in fact) mislead the Examiner into granting a patent which he would otherwise not have granted. Moreover, and most importantly, there is no showing of an intent deliberately to mislead the Examiner or that he was in fact misled. We find that defendant has failed to maintain its burden of proof as to the fraud alleged to have been practiced upon the Patent Office, whether treated as a defense or as defendant's anti-trust counterclaim.

We come now to the matter of the alleged "misuse" of the patent. Defendant argues that should we decide as to infringement or other issues in plaintiff's favor, nevertheless plaintiff cannot maintain any enforcement action against defendant because plaintiff has "misused" the patent.

■ The argument by defendants that Kolene has misused the patent comes to us with very skimpy proofs. We know very little about Kolene's quantitative use of the patents in the industry, this arising from defendant's disclaimer of any anti-trust violation though it relies heavily upon anti-trust cases by way of analogy, should analogy there be. Much of defendant's "misuse" case rests

squarely upon argument and speculation. Very few hard facts are presented. Analogies from the anti-trust field, as we have noted, are heavily relied upon, but it must be kept in mind that this is not an anti-trust case. If it were, it would fail, even under the *per se* doctrine, for there is no showing that a "not insubstantial amount of commerce" is affected. Northern Pac. R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1957). As to analogies it is well also to keep in mind that we are cited to both patent and trademark cases, involving both the anti-trust laws and the *Morton Salt* doctrine of misuse. The permutations and combinations possible with two sets of rights involving two types of remedies, in various postures of association, without any discernible unifying thread of legal or economic principle, warns us to consider and to use the analogies with some caution. These observations are peculiarly relevant to the trademark (or patent) issue involving the franchised heat treaters, *infra*.

As will be later set forth in detail, Kolene does business with two types of shop, "captive" shops and heat-treater franchisees. With respect to each, defendant argues that there has been a "misuse" of the patent itself, relying, among other cases, on the *Morton Salt* [18] case. This case held that the holder of a patent on a salt depositing machine, who had licensed the patent for use only with salt purchased from him, could not maintain suit against the manufacturer of an infringing machine. " * * * [C]ourts, and especially courts of equity," it was held, "may appropriately withhold their aid where the [patentee] is using the right asserted contrary to the public interest". This proscription of denial of remedy is not, then, automatic. We are remitted to a consideration of "the public interest."

To view this matter in its proper setting upon the facts before us it is necessary to review in somewhat more detail not only the relationship between the parties, but Kolene's method of doing business in this respect.

As we have previously noted, in the summer of 1959, with the permission of Lucas Miel, then President of Commercial, Mr. Bidigare went to Germany with Mr. Shoemaker as a technical adviser, to learn the process-in-suit from Degussa. It was taught to them in confidence upon assurance that it would not be used as against Degussa. It is clear that Mr. Bidigare had never, prior to that time, heard of the process. Upon returning to this country Mr. Bidigare set up and operated a Tufftride installation at Commercial, in a joint venture with Kolene, in which Kolene provided the salt free of charge to Commercial. During this period Mr. Bidigare and Mr. Shoemaker attempted to exploit the process and advertising literature was prepared. Thereafter, in 1960, Commercial and Kolene split up. The reason is not shown in the record. We gather that animosities existed between the parties.

Miel and Commercial, after the split up, continued to practice and promote the process but changed the trademark from "Tufftride" to "Nu-Nitride".

In 1962, when the patent-in-suit issued, Miel and Bidigare sought legal advice on how to avoid the patent, making, pursuant to such advice, what we have decided heretofore are slight changes in the salt concentrations and in the equipment. It is clear, however, that they did not give up aeration, which was the gist of the patent-in-suit.

Litigation between Commercial and Kolene regarding contractual agreements, breaches of confidence, patent infringement, and other issues thereafter took place, all of which issues were settled in 1963 after Miel, Bidigare and Grafmiller left Commercial. Thereafter, Commercial became a Tufftride franchisee. In the same year, 1963, Messrs. Miel, Bidigare, Grafmiller, and other

18. Morton Salt v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363 (1941).

former Commercial employees formed the defendant, Motor City. At all times Motor City has operated the accused process, with the exception of equipment (pot or liner) changes, substantially as it had at Commercial but under the name "Cynatride". To complete the picture we will merely note that there are certain off-shoots to the Commercial operation. Miel and Bidigare taught the process to Industrial Heat Treat of Charlotte, North Carolina, and licensed Industrial to practice the process under Commercial's trademark "Nu-Nitride". Industrial made duplicate copies of Kolene's advertising materials for Tufftride, changing only the word "Tufftride to "Nu-Nitride." All of this was done without Kolene's permission or license but with Commercial's active assistance. During this same period, the Nu-Nitride process was licensed to a Canadian company controlled by Miel, the Preston Heat Treat company, which shortened the trademark to "Nutride". It is noteworthy that Kolene has not sought injunctive or other relief against these processors so far as this record discloses.

We do not more fully explore the Commercial litigation since we were informed at the trial, by defendant's counsel, that such litigation he viewed as lacking relevance to the issues under litigation.[19]

19. *Tr. pp. 180–183:* "MR. CULLEN: Excuse me. May I say something to the Court? The Court should understand, to keep this testimony in proper perspective, that at the beginning the Kolene people and Mr. Miel and Bidigare of Commercial Steel Treating were working together in a joint effort. Subsequently, there was a falling out between Mr. Shoemaker, on the one hand, representing Kolene, and Mr. Miel, on the other hand, representing Commercial.

"As a result of that falling out, and subsequent to that falling out, Commercial Steel Treating Company, which was then under the control of Mr. Miel, went its own way and practiced the process that they were practicing, and they now adopted the trademark 'Nu-nitride,' and they were continuing their operations without regard to any claim of right of Kolene.

"There was litigation between the Kolene people and between Commercial Steel Treating during the time that Mr. Miel controlled the operations of Commercial. Subsequently, the principal stockholders of Commercial Steel Treating Company had a falling out with Mr. Miel, and Mr. Miel left Commercial Steel Treating Company to form Motor City Company.

"Meanwhile, the stockholders of Commercial Steel Treating Company then returned back into operation with Kolene and became a licensee, and exclusive licensee for the Detroit area, except for Kolene's own operations under the Franchise system.

"Now, Mr. Miel and Bidigare, having left Commercial Steel Treating Company, formed Motor City Company, the present defendant, and continued in Motor City Company the same operations that they had previously performed in when they were in the employ of Commercial Steel Treating Company, and in the operations of Motor City Company, the same people, by the way, now call their process 'Cynatride.'

"This explains the peculiar thing, that Commercial Steel Treating Company was at one time controlled or operated by Mr. Miel and later was not, and also the peculiar fact that at one time Commercial Steel Treating Company was in a joint venture with Kolene and then later had a falling out with Kolene, and then still later returned to use the Kolene trademark and the Kolene services and literature and publicity and sales effort as a franchisee of Kolene.

"THE COURT: That is the corporation itself and not the individual?

"MR. CULLEN: That's right.

"THE COURT: All right.

"MR. CANTOR: Perhaps I might shorten the questioning of the witness, since this witness was obviously intimately acquainted with those facts.

"Q (By Mr. Cantor) Is Mr. Cullen's statement correct, Mr. Shoemaker?

"A Correct, yes.

"Q Would you be willing to adopt that as your testimony as an answer to a question?

"A Yes.

"MR. CANTOR: Is there any objection to that?

"MR. ADELMAN: No. I only want to say I was hoping we could avoid getting into the issues *of that prior litigation, which I view as having no bearing on this lawsuit whatsoever."* [Italics the Court's]

In addition to the Commercial litigation during the time that Mr. Miel controlled Commercial, there was litigation between Kolene and Mr. John Sheppard, a retired metallurgist and chemicals salesman. Mr. Sheppard had furnished salts for the accused process to Commercial during the time it was operated by Mr. Miel, and thereafter furnished them to Motor City. Apparently as a part of the litigation with Commercial (prior to the departure in 1963 by Mr. Miel) or at about the same time, Kolene sued Sheppard for patent infringement, and later, convinced that he was not so infringing, dropped the suit. The defendant refers to Mr. Sheppard as a "manufacturer of salts". The description is hardly apt. Mr. Sheppard's activities with respect to the defendant's operation were described in some detail by Mr. Grafmiller, formerly of Commercial, later one of the organizers of defendant Motor City, its president, and general manager. He testified that the salts used by Motor City were "made there on our property," and that an employee of Motor City assisted Mr. Sheppard in his work, "after hours". Mr. Sheppard used Motor City's equipment and their space, on which he paid no rent. The record is utterly devoid of any testimony as to what would normally be called a bona fide manufacturer's plant operations, volume of business, equipment, number of employees, or otherwise. Actually, it would seem that what Mr. Sheppard did, first at the premises of Commercial and then Motor City, was to cast cyanate bricks for use in the process by Grafmiller. Mr. Sheppard's operations respecting the salts hardly rise to the dignity of being a "manufacturer thereof" as the term is normally used. We have gone into these suits in some detail, despite counsel's disclaimer, since they form the basis of the charge, essential to the application of the misuse doctrine to the captive shops, that Kolene was "vigorously enforcing" its patent.

The argument by defendant that Kolene has misused its patent on the process requires a considerably detailed exp
position of Kolene's methods of doing business with respect to the process-in-suit. Its business is that of selling salts and equipment used in chemical processes. With respect to the process-in-suit, Kolene sells equipment and salt to two classes of customers: a) the so-called "captive" shops, accounting for about 98% of the market, which are merely the heat-treating departments of corporations which process their own industrial parts; b) the so-called "heat treaters", independent operators, accounting for about 2% of the market, operating under franchises. This is a service type of business. These heat treaters process parts sent to them for treatment by their various customers.

With respect to the captive shops and the heat treaters using the process-in-suit, there is a different sales policy as to each, arising out of the differences in their methods of operation. The captive shops do their own work in their own shops and the responsibility for improperly treated parts is solely their own. Kolene sells equipment and salts to them upon purchase order. With them it has no agreements, contracts, or licenses. They are free to make purchases of their materials and equipment wherever they see fit, although as a practical matter they buy their salts and most of their equipment for the process from Kolene. These captive shops are also brought and kept abreast of technical improvements in the art through Kolene's technical help of various kinds.

The situation with respect to the "heat-treater" franchisees is substantially different. There are eleven heat treater licensees located in various parts of the United States, one of them (Lindberg) having multi-plant operations in widely scattered places. Each of these franchisees is required to operate in accordance with Kolene's controls and procedures, and to buy all salts used in their "Tufftride" baths from Kolene. Each franchisee sells its Tufftride services under the trademark "Tufftride", relying (as do its customers) upon that trade-

mark and its good will and reputation to sell to its industrial customers.

With respect to these franchisees, an outside company sends its parts to a heat-treater to be "Tufftrided". Uniformity or consistency of treatment is an important factor. There may be substantial lapses of time between successive orders. There are widespread geographical separations between locations of either the same heat-treater, in its various branches, or between different heat-treaters. An example given the Court [20] was that of a customer who "has a plant in Peoria, * * * and a plant in York, Pennsylvania and a plant in San Dreando (sic), California, and he desires Tufftriding work done, that he could send to a licensee in California or into Pennsylvania or in Illinois and secure the same quality, the same product, the same process as he would get from any of the other licensees." International Harvester,[21] for example, sends the same crankshafts both to Commercial in Detroit and Lindberg in Melrose Park, Illinois. Moreover, not only the heat-treaters but their customers turn to Kolene for aid in the solution of problems which have arisen in the heat-treater shops. In addition, such shops must conform to an expected standard of work, as contrasted with the captive shop which, for its own work, may set its own standards, accepting or rejecting as it wishes. The franchisees pay a royalty to Kolene based upon their Tufftride business volumes. In addition, they are required to buy salts used in the trademarked "Tufftride" process, but not their equipment, from Kolene. Kolene argues that the salts must be of the same proven formulation, quality, and purity, the salts forming a major integral part of the process. It is argued, as well, that merely setting specifications for salts obtainable from different sources will not achieve the coast-to-coast uniformity of treatment necessary for the product.

With respect to the captive shops, it is Kolene's position that their sales policy was to sell on the basis of being a good supplier, that it does not use patents as a sales weapon, that the business is the sale of salts and that it would not, nor has it ever, refused to sell salts to anyone. Defendant counters with the argument that the plaintiff has used its patent "to coerce captive shops to purchase unpatented salts from the plaintiffs", relying upon such cases as Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938); B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942); Lincoln Electric Co. v. Linde Air Products Co., 171 F.2d 223 (CA 6, 1949) and, of course, Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 315 U.S. 788, 62 S.Ct. 402, 86 L.Ed. 363 (1941). These are but a few of a host of cases all involving the same principles, all of which are based expressly or impliedly upon the element of coercion. See, Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc., 367 F.2d 678 (CA 6, 1966). A fair summarization of these cases would seem to be that the courts require for application of the doctrine, a showing that while the patentee was permitting the use of the patent to his own customers, he was, as a practical and substantial concomitant, denying the use of it to others, by suit, threat, or otherwise. It is noted, for example, in our earlier Sixth Circuit case (*Lincoln Electric, supra*) that the patentee was vigorously enforcing its patent rights under the patent claims against sellers of the unpatented elements.

It is just at this point that defendant fails in his evidentiary showings. Although it asserts "vigorous enforcement" by Kolene, it turns out that the vigorous enforcement referred to are the old suits at the time of the breakup of Commercial and Kolene and nothing more, either against Nu-nitride, or other off-shoots of the Commercial operation. It urges vigorously that with respect to

---

20. Shoemaker, Tr. 316.

21. Ex. 5. Hall dep., pp. 26–27.

the captive shops (which do not employ the trademark Tufftride), the practice of Kolene is to force the use of the salts by lawsuits. "You have to have it [an implied patent license] or you go out of business because they sue everybody."[22] What defendant is asserting here is actually coercion. It is reminiscent of the statement of the Court in Switzer Brothers, Inc. v. Locklin, 297 F.2d 39 (CA 7, 1961) that the patentee had threatened "all non-licensed manufacturers and all users of non-licensed devices with patent infringement suits" and had commenced suits "in widely scattered parts of the United States against dealers, manufacturers, users, and customers", and the argument made in *Lincoln Electric, supra*. But defendant's argument in the case before us founders on the record. There are before us no such suits. There is no evidence of threats of infringement, and no evidence of any kind that the captive shops or any franchisee have been pressured in any way by the existence of the patent-in-suit or its employment. The same situation obtains with respect to the words "Patent Pending" appearing on some drums shipped into the United States by Degussa. Defendant argues that the purpose of such words "is unlawful coercion". Mr. Shoemaker testified that the appearance of such words was either an oversight or a mistake of fact by plaintiff relating to the pendency of relevant patent applications. At any rate no evidence was presented that anyone other than defendant's counsel was either aware of or interested in or disturbed by this language and we regard it as inconsequential.

In short, on this issue of coercion raised by the defendant, all that we have is counsel's charge and speculation, unsupported by evidentiary showings. Far more than this is required for the application of the *Morton Salt* doctrine, harsh as it is and involving forfeiture as it

does, since its meaning is that a patentee cannot enforce his rights against deliberate infringement. No threats have been shown to us and no disgruntled user, or would-be user, has appeared before us. It is inconceivable to us that an entire industry could have been so intimidated. Upon the record we cannot find that the patent-in-issue has, in this suit, or any other, been held as a club over the salt users to bring them into line. It is our judgment, having heard and seen the witnesses presented, as well as other evidence, that the charge is without foundation.

The trademark tie-in, involving about 2% of the industry, remains for consideration. The objectives of trademark protection were summarized in a Senate Report[23] on the Lanham Act[24] as follows:

a) " * * * [T]o protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get.

b) " * * * [W]here the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats." [Paragraphing used is the court's]

It must be recognized that we have two opposing considerations at this point, each of which has powerful support. On the one hand we have the anticompetitive effects inherent in any tying arrangement. On the other hand we have a trademark licensor's efforts to preserve the good name and integrity of his product. As Mr. Justice Holmes observed in Bourjois & Co. v. Katzel, 260 U.S. 689, 692, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1923), a trademark "deals with a delicate matter that may be of great value but that easily is destroyed, and

---

22. Tr. May 28, 1969, p. 16.

23. S.Rep. No. 1333, 79th Cong., 2d Sess. 1, 3 (1946); U.S.Code Congressional Service, p. 1274.

24. 60 Stat. 427 (1946), 15 U.S.C. §§ 1051–1127 (1958).

therefore should be protected with corresponding care," going on to say "[I]t stakes the reputation of the plaintiff upon the character of the goods". There are few cases in the field, none on all fours, and the literature is sparse and inconclusive.[25]

The defendant relies heavily upon Switzer Bros. v. Locklin, 297 F.2d 39 (CA 7, 1961). In this case the patentee sought the most extensive controls, since "The licenses required, as a condition for the grant thereof, that the licensee purchase all materials from Switzer, or sources approved in writing by it, *not only for production of the patented devices, but also for the production of all daylight fluorescent devices.*"[26] [Emphasis ours.] There is no such parallel here. Moreover, the case involved both patent and trademark tie-ins, the Court concluding that the appellants had misused both the patents involved and the trademark "in restraint of trade in interstate commerce in violation of the antitrust laws". There is no claim of an anti-trust violation made in our case. The case of Susser v. Carvel Corp., 332 F.2d 505 (CA 2, 1964) is more in point, although it also involved charges of violation of the anti-trust laws. There the Court divided, but both opinions held that a tying might be justified as necessary to protect a trademark. The majority held that a trademark tie-in, to be illegal, must meet the same tests applied in a patent tie-in situation, namely, both market dominance and the affecting of a substantial amount of commerce, the plaintiff failing there in establishing either element. The defendant here makes no effort at such a showing. Its argument is that the heat-treater franchises really involve a patent tie-in, not a trademark tie-in, and thus the franchises offend public policy, under the *Morton Salt* case, *supra*. Is the arrangement before us, then, a patent tie-in or is it a trademark tie-in? We pursue the same inquiry as did both the trial and appellate courts in Susser v. Carvel Corp., *supra*, in asking, What is the focus of the arrangement?

We turn to the franchise contracts themselves and examine that of the Getchell Steel Treating Company, Inc., a Minnesota corporation. The franchise, it states therein, concerns the "Tufftride" process. Granted are certain exclusive area rights, in which the licensee may "practice the Tufftride process and * * * use Tufftride apparatus and materials". Kolene agrees to furnish advertising materials, technical help and training, and to conduct inspections to assure "consistently high quality". The purpose of the latter provisions is to safeguard the quality on a nationwide basis for the benefit of customers relying on the Tufftride name, reputation, and trademark. The only reference to the patent (which had issued some three years previously) is in the first paragraph in which the "Metal Treater" agrees to honor all of Kolene's and Degussa's rights, "including all patents, issued or to be issued in the future * * * *".

Defendant does not demonstrate to us any focus on the patent itself by any direct evidence of record. Its argument rests on speculation and conjecture, as did its argument with respect to the "pressuring" of the captive shops, allegedly to force them either to buy Kolene salts or face suit "because they sue everybody". Defendant points to an amendment made in the licenses approximately a year after the patent grant, which amendment required the purchase of Kolene salts. As to this amendment, on the other hand, plaintiff submits exhibits (see Exs. W and Y) on the basis of which it argues that such requirement was imposed as a part of a review and recast of their method of doing business, including re-allocation of exclusive territorial rights (Ex. B to Ex. Y). Again, we are in the realm of spec-

25. See, Schniderman, Trade-Mark Licensing —A Saga of Fantasy and Fact, 14 Law and Contemp.Prob. 248, 259–268 (1949);

Timberg, Trade-marks, Monopoly, and the Restraint of Competition, Id. 323.

26. 297 F.2d 39, 44.

ulation. We cannot find the causal relation asserted by the defendant upon the evidence before us.

We construe this instrument not only within its four corners but with reference to the testimony of Mr. Shoemaker, who described in detail Kolene's method of doing business. The focus here clearly is the trademark "Tufftride", the term coined by Mr. Shoemaker himself in an effort to avoid the disparagements which had been cast upon the words "soft nitriding", which had been employed at an early stage in the art. The trademark or service mark [27] Tufftride has become known on a nationwide basis and it is to the protection of such mark that the franchise agreement is principally devoted.

With respect to the widespread use of the trademark Tufftride and reliance thereon we have previously noted that the defendant itself receives (and processes) orders from Firestone and the Chevrolet Division of General Motors calling for the "Tufftride" process. Defendant informs its customers, we are told, that its process is not Tufftride but Cynatride "and its equivalent". Counsel continues "I admit that we're riding on the good will of the process insofar as it has good will, and we're entitled to do that in a competitive economy, absent a valid patent. That's what we're talking about here, is that patent valid?"

Moreover, it is significant to us, among other factors, that in the captive shops, which use the process-in-suit and comprise 98% of the market, but which is a non-trademark situation, there is no requirement that these large shops purchase their salts from Kolene. It is only with respect to the 2% remainder, scattered all over the country, operating under the Tufftride trademark, a process requiring uniformity for industrial use, that the purchase of salt requirement is made. Since both segments of the market are using the patented process it is the more difficult to say that the control is based upon the patent rather than the trademark.

We find the focus of the franchises, then, to be upon the trademark Tufftride and, considering the need for nationwide dependability, reliability and uniformity of quality and purity of the salts used by those using the Tufftride trademark, the difficulties of supervision of operation nationwide as to salts from different sources, even though conforming to specifications and within commercial limits of purity, (available commercial grade cyanides have 2–4% unknown impurities) considering as well the lethal nature of these salts (i. e., cyanide) and the difficulties encountered in the efforts of Mr. Shoemaker to mix them, as well as the fact that this is a relatively new process, it is our judgment that under the unique circumstances of this case the salt purchase requirement by the heat-treater shops is not unreasonable.

The finding thus made is determinative of the case under defendant's theory. It concedes (Defendant's Supp. Brief, p. 2, submitted following oral argument on this phase of the case) that "if the focus of the franchise agreements were, in fact, the Tufftride mark, rather than the patent-in-suit, then defendant's charge of misuse would fail".

We will add that even without the concession, *Morton Salt* itself makes it clear that the doctrine there enunciated is not to be taken as dogmatic and its application automatic. Denial of remedy against an infringer is a harsh remedy, a species of forfeiture. And just as there is now found, in amelioration of the adamant application the per se rule [28] to tying contracts in anti-trust law, the doctrine of business justifica-

---

27. For the purposes of this case a distinction is unnecessary.

28. This term involves both a semantic and a procedural wilderness. Compare (as to "market dominance" alone) Northern Pac.

Ry. v. United States, 365 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) with Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) ; compare also United States v. Loew's, Inc., 371 U.S. 38, 83

tion,[29] so it would seem that the *Morton Salt* doctrine should admit of similar amelioration, even if this were indeed found to be a patent tie-in, in the light of *Morton's* requirement that the plaintiff must be using the right asserted "contrary to the public interest." In all of the welter of words and literally volumes of learned discussions in the area of anti-trust, per se violation, business justifications, and all the rest, we are impressed by the down-to-earth observations of the Fifth Circuit in the case of Denison Mattress Factory v. Spring Air Company, 308 F.2d 403, 408, in upholding a trademark agreement against assault under the anti-trust laws that

"* * * the cases do point out that courts are prone to look at the primary purpose of a contract to determine its validity. If the primary purpose, however disguised, is to stifle competitiors and create a monopoly, then the agreement or contract is struck down. However, the cases seem to follow the principle that if the primary purpose of the contract is lawful, e. g., to protect one in the fruits of his labor, and if the arrangement was actuated by or could be explained on the basis of legitimate business justification as opposed to the desire to increase market control through economic leverage, then the court will generally hold any incidental restraint of trade, not harmful to competition of the public to be lawful. Dehydrating Process Co. v.

Smith (CA 1, Cir. 1961) 292 F.2d 653. Therefore, it is our duty to determine whether the general primary purpose of the contract under consideration was to protect Spring-Air in its product, and then determine more specifically whether the provisions of the contract complained of here violate any antitrust law."

Under the facts as we have found them and the law applicable thereto we need not consider plaintiff's offer to defendant, made in 1968 after suit was instituted, of a license giving defendant full freedom to practice the process without either controls or the salt-purchase requirement, conditioned, however, along with other requirements, that defendant take care to remove any belief or impression in the trade that it was a franchised Tufftride heat treater. Defendant urges this as an implied admission of guilt. Plaintiff points to it as evidence of complete good faith. If we were compelled to make a choice we would, after seeing and hearing the witnesses, accept the good faith explanation. We find no misuse of the patent, either as to the captive or the franchised shops and we so hold.

It is our conclusion that Claim 1 of the patent-in-suit is valid and has been and is infringed by defendant and that plaintiffs are entitled to a judgment granting an injunction against further infringement and an accounting awarding damages as sought by the Complaint. A suitable order may be presented.

S.Ct. 97, 9 L.Ed.2d 11 (1962) with White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

29. See, Comment, 62 Mich.L.R. 1413, Tying Arrangements under the Anti-Trust Laws: The "Integrity of the Product" Defense; Note, 72 Yale L.J. 1171 (1963). See, also, Baker v. Simmons

Co., 307 F.2d 458 (CA 1, 1962); Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653 (CA 1), cert. den. 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed. 2d 194 (1961); United States v. Jerrold Electronics Corp., 187 F.Supp. 545 (E.D.Pa.1960), aff'd per curiam 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).