**KOLENE CORPORATION, and Deutsche Gold-und-Silber Scheideanstalt Vormais Roessler, Plaintiffs-Appellees,**

v.

**MOTOR CITY METAL TREATING, INC., Defendant-Appellant.**

**No. 20107.**

United States Court of Appeals, Sixth Circuit.

March 9, 1971.

Rehearing Denied May 7, 1971.

---

Martin J. Adelman, Birmingham, Mich., for defendant-appellant; Barnard, McGlynn & Reising, Gerald E. McGlynn, Jr., Birmingham, Mich., on brief; Feikens, Dice, Sweeney & Sullivan, Joseph Levin, Detroit, Mich., of counsel.

Bernard J. Cantor and Daniel G. Cullen, Detroit, Mich., for plaintiffs-appellees; Cullen, Settle, Sloman & Cantor, Richard D. Grauer, Detroit, Mich., on brief.

Before PHILLIPS, Chief Judge, and PECK and BROOKS, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal from the order of the District Court holding a patent valid and infringed. We affirm.

For an extensive discussion of the facts of the case reference is made to the opinion of District Judge Talbot Smith, reported at 307 F.Supp. 1251 (E.D.Mich.). A summary of pertinent facts will be stated in this opinion to the extent necessary to dispose of the issues presented on appeal.

### The Prior Art

The patent in suit, U. S. Letters Patent No. 3,022,204, concerns the treatment of metals to improve their strength and wear properties. At the time of the invention both inventors were employees of Deutsche Gold-und-Silber Scheideanstalt Vormals Roessler (hereinafter referred to by its tradename "Degussa"), a German corporation. Kolene is the exclusive licensee of the patent in the United States.

In the early 1950's, the treatment of metals to upgrade their strength and wear properties was carried out by two distinct conventional nitriding processes, "gas nitriding" and "liquid nitriding."

"Gas nitriding" is carried out by placing the steel part to be treated in a chamber at a temperature of about 520° C. and then passing into the chamber a current of ammonia gas for at least 24 hours.

"Liquid nitriding" is practiced by placing the steel part to be treated in an aged salt bath containing a cyanide salt at a temperature of 565° C. One of the effects of the aging is that, at the surface of the bath, a portion of the cyanide salt reacts with oxygen in the air to form cyanate, 2 CN (cyanide) $+$ $O_2$ (oxygen) $=$ 2CNO (cyanate). This surface aeration creates a bath having 5–15% cyanate.

Both these processes operated to harden the surface of the treated part but they had serious side effects, one of which was causing the part to distort and become very brittle. The processes also took considerable time, were extremely expensive, and were limited to specific applications. They could not be used to nitride low carbon steels.

Around 1954 Dr. Muller, a metallurgist employed by Degussa, discovered that by operating a liquid nitriding process with a bath having a relatively high cyanate content (i.e., roughly 30%), the wear resistance of a treated workpiece was substantially improved without the previously attending brittleness. At least by 1958 Dr. Muller had discovered that a 30 per cent cyanate bath process also remarkably increased the fatigue resistance of low carbon steels. Both these discoveries became part of the prior art with respect to the patent in suit by virtue of Dr. Muller's publications acclaiming their merits. To describe the newly discovered process, Dr. Muller coined the phrase "soft nitriding," which contrasted the new process with the brittleness of workpieces treated by the old liquid and gas nitriding processes.

The original "soft nitriding" process saw considerable exploitation in Europe,

but after some time it was found to have one fatal drawback—the lack of uniformity. As a result of this deficiency, use of the process was discontinued. Thus, as found by the District Judge, the original "soft nitriding" process was a commercial failure.

### The Invention

In February of 1959, Dr. Muller, and Carl Albrecht, another Degussa technical employee, jointly conceived the idea of bubbling air up through the salt bath (a technique referred to as "sub-surface aeration" or simply "aeration"). Aeration of the 30 per cent cyanate bath proved to be the key to uniformity. Moreover, for some as yet unexplained reason, the quality of the process was improved. This improved process was also referred to as "soft nitriding" but was introduced in this country by Kolene under the servicemark "TUFF-TRIDE."

### The Prosecution History of the Patent

In October 1959, a patent application (Serial No. 844,382) was filed in the U. S. Patent Office in the name of Dr. Muller. This application was directed to the non-aerated process which employed a bath having at least 30 per cent cyanate. This application was abandoned in 1962.

In the meantime, on March 25, 1960, an application (Serial No. 17,541) had been filed on the process of the present invention. Claim 1 of this application read:

"1. A method of treating metals having a surface adapted for nitriding which comprises immersing such metals in a fused salt bath containing alkali metal cyanide and alkali metal cyanate maintained at a temperature between 500 to 600° C while passing a finely divided oxidizing gas through said fused salt bath."

This claim was rejected on the basis of a British patent disclosing a process for treating metals which included a bath having up to 15 per cent cyanate and with an ammonia gas bubbling up through the bath. A second rejection was made on the basis of the British patent in view of Dr. Muller's earlier U. S. patent No. 2,927,875, which disclosed the nonaerated bath of 30–40 per cent cyanate.

In response to this rejection, applicants' attorneys canceled claim 1 and substituted the following:

"12. A process comprising immersing a metal workpiece in a molten alkali metal salt bath comprising between about 25 and 40% cyanate, at least about 50% cyanide, the remainder being substantially carbonate, the said bath being free of sulfur, selenium and tellurium, while aerating the bath with an oxygen-containing gas introduced in well-distributed fine bubbles."

After a number of conferences with the Examiner and persuasive written argument (which we will consider later in this opinion), claim 12 was allowed. Claim 12 was then transferred to an application filed March 20, 1961, Serial No. 97,060, which application materialized into the patent in suit. Claim 12 was numbered as claim 1 in the latter application and in the patent, and that claim is the center of the present controversy.

### The Alleged Infringement

Motor City, the appellant, is something of a spin-off of Commercial Steel Treating Corporation, another Detroit heat treating establishment which worked with Kolene in exploiting the invention in the early days of "TUFF-TRIDING." Mr. Miel, the present controlling stockholder of Motor City, was president of Commercial at that time. When Commercial and Kolene had a parting of the way, Miel left Commercial and established Motor City for the purpose of heat treating metals under a process called "CYNATRIDE." The "CYNATRIDING" process of Motor City involves immersing a workpiece in an aerated salt bath having something between 46 and 50 per cent cyanate.

No improvement in the process results from using a bath with 46–50 per cent

cyanate as compared to a bath with cyanate in the exact range of 35–40 per cent. This percentage of cyanate was selected, according to Miel, on advice of counsel to avoid infringement of the patent.

In response to the instant suit, Motor City defends on the grounds that: (1) The patent is invalid, (2) the accused process does not infringe, (3) the patent is unenforceable because of fraud on the Patent Office in its procurement, and (4) the patent is unenforceable because of plaintiff's misuse. We shall consider each of these defenses separately since the pertinent considerations differ for each.

### Invalidity

Motor City admits that the patented process is new and novel, but contends that it is obvious within the meaning of that term in 35 U.S.C. § 103.

The question of "obviousness" in determining patent validity is a mixed question of both fact and law. Kaiser Industries v. McLouth Steel Corp., 400 F.2d 36, 41 (6th Cir.); National Filters, Inc. v. Research Products Corp., 384 F.2d 516 (5th Cir.); Hensley Equipment Co. v. Esco Corp., 375 F.2d 432 (9th Cir.). In ruling on that question the Supreme Court said:

"(1) Under § 103, the scope and content of the prior art are to be determined;

"(2) Differences between the prior art and the claims at issue are to be ascertained;

"(3) And the level of ordinary skill in the pertinent art resolved.

"(4) Against this background, the obviousness or nonobviousness of the subject matter is determined.

"(5) Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries

may have relevancy." [Note: Clauses separated and numbered for convenience.] Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545.

When the District Court determines items numbered 1, 2 and 3, it makes findings of fact which are binding on appeal unless the findings are clearly erroneous. Rule 52(a), Fed.R. Civ.P. It is the ultimate determination of the trial judge (item number 4 above) which is a conclusion of law with which this Court may disagree based on the established findings of fact. See Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 332 F.2d 406 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93.

We will not review Judge Smith's findings of fact except to point out that he found that nothing in the prior art suggests aeration of the 30 per cent cyanate bath. We are in complete agreement with that finding and his conclusion that the invention was not obvious at the time it was made.

We note that the known reaction of cyanide with oxygen to produce cyanate and the known beneficial effect of a liquid nitriding process operated with a 30 per cent cyanate bath would not have made the claimed invention obvious to one skilled in the heat treating art at the time the invention was made. When the effect on the process of the 30 per cent cyanate bath became known, the art would suggest that any aging or oxidation would no longer be necessary since the purpose and effect of aging was to raise the cyanate level of the bath to about 15 per cent. Assuredly nothing in the prior art would suggest aeration of the 30 per cent cyanate bath.

### Infringement

The District Court found that the accused process infringed Claim 1 of the patent in suit. Motor City alleges that this was error for two reasons. First, it says that the accused process does not come within the scope of protection of the patent because the claim

does not literally "read on" Motor City's process. Second, while apparently admitting that the accused process is the full equivalent of the patented process, Motor City contends that the plaintiffs are estopped, by virtue of the doctrine of file wrapper estoppel, from enforcing this patent against the accused process. We conclude that both these points of alleged error are without merit.

On the question concerning the literal reading of the claim, we first emphasize that the patent is directed to a process and that the claim specifies the steps of immersing a workpiece in a bath while aerating the bath. Motor City's process employs both these steps. We do not intend to imply that the ingredients of the bath are not important. The process is ineffective with a bath having less than 25 per cent cyanate. In that sense, the percentage of cyanate is critical—as was pointed out during prosecution before the Patent Office by applicants' attorneys.

The limits of the claimed percentages were established on the basis of different considerations. The lower limit was operational (i. e., the process would not achieve the desired result below about 25 per cent), and the upper limit was practical (i. e., because of a sludge problem it was not economical to operate above about 40 per cent). When the sludge problem was solved and it became feasible to operate at 46–50 per cent cyanate, we agree that for practical purposes this was within the range defined by the claim. We therefore agree with the District Court that the claim literally reads on the accused process. Our decision on this point is also affected by the fact that Motor City chose the 46–50 per cent cyanate operating level for no other purpose except to avoid infringement of the patent.

█ Motor City contends that it is protected by the doctrine of "legitimate design around," which recognizes the right of one to look at a patent, make a good faith determination of its scope of protection and then design a process or product that skirts that protection. We

recognize that doctrine, but also recognize its underlying purpose—namely to encourage research which will develop new ways of doing the same thing. In this case, Motor City has done nothing new. It has done nothing more than merely appropriate the patentees' idea. This court does not condone that type of activity.

█ Since we agree with the District Court that the accused process infringes by a literal reading of the claim, according to the statement of the Supreme Court in Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097, "that is the end of it." However, since Motor City presses so vigorously the doctrine of file wrapper estoppel, we consider the contention briefly. The doctrine of file wrapper estoppel can be invoked only after infringement has been shown through application of the doctrine of equivalents. Since the accused process requires the same steps and operates in the same manner, to achieve the same results as the patented process, there is no question that it is an infringement under the doctrine of equivalents. The only question then is whether the owners of the patent are estopped, under the doctrine of file wrapper estoppel, from enforcing the patent against the accused process. This will be determined by a consideration of the events that transpired in the Patent Office.

█ We have already noted that applicants' attorneys emphasized the lower percentage of cyanate in the bath as critical. However, as was recognized by the District Court, the percentage of cyanate was critical to the process, not to the patentability of applicants' invention. Applicants discovered the beneficial effects on the process of aeration of the bath. This was what they represented as their contribution to the art originally and they maintained that position throughout the prosecution before the Patent Office. By adding to the claim the operable percentage limits applicants did not disclaim those percen-

tages that were equivalent thereto. We specifically note that in his remarks to the rejection of claim 1 on the basis of the British Patent, applicants' attorney took the position that the reference was "inapplicable even to claims 1 and 2 in their original scope." A review of the entire prosecution history of this patent convinces us that protection of the *aerated* process was applicants' primary concern, and the references to the percentages of cyanate in the bath as being critical were intended to define an operative process, and to call the Examiner's attention to the differences in the process and the prior art generally rather than to distinguish the cited prior art in terms of patentability. We therefore agree with the District Court that no file wrapper estoppel exists and that the accused process infringes by application of the doctrine of equivalents.

### Alleged Fraud on the Patent Office

 The District Court found that there was no evidence of fraud since Motor City had only referred to the file wrapper in support of this defense. While we recognize that in some cases the file wrapper may be sufficient evidence of the defense of unenforceability because of fraud in procurement of the patent, that situation does not exist in this case.

 The District Court found that the patent application itself disclosed the prior art 30 per cent cyanate process, 307 F.Supp. at 1262, and that finding is not clearly erroneous, Rule 52(a), Fed. R.Civ.P.

We agree with the District Court that the file wrapper is replete with instances where the Examiner was advised that the 30 per cent cyanate bath was prior art. The Examiner must be given credit for the ability to recognize the inference that seemed unquestionably clear to the District Court and is equally clear to this Court.

In a supplemental brief Motor City has called to our attention a recent case from the Court of Custom and Patent Appeals, Norton v. Curtiss, 433 F.2d 779, which considered the defense of fraud in the context of a priority determination. The *Norton* case considered fraud of two types: (1) technical fraud which is actionable in itself, and (2) an unclean hands defense based on inequitable conduct.

Clearly there is no technical fraud in the present case. We already have held that the claim in question is valid in spite of the allegedly withheld prior art.

The record convinces us that they lacked the "scienter" or fraudulent intent that is an integral part of the defense of fraud. When they applied for their patent, applicants were concerned with their discovery regarding the beneficial effect of aeration. There is nothing in the record to evidence that they thought that the prior art 30 per cent cyanate bath was pertinent, in a patentability sense, to their discovery. The record discloses to our satisfaction that the argument of applicants to the Examiner was made in good faith and there was no breach of the duty of candor before the Patent Office.

### Patent Misuse

The primary business of Kolene is the sale of salts to make the cyanate bath and equipment for use in the "TUFF-TRIDE" process. It sells to two different types of customers: (1) captive shops, and (2) heat treaters.

Captive shops are establishments such as Ford Motor Company and General Motors, which are only interested in treating their own parts in an in-house operation. They accept no parts for treatment from outside sources and do not advertize their practice of the process either under a servicemark or otherwise. Kolene has an established and publically announced policy that any concern desiring to use its patented process in a captive shop operation is free to do so and that no license is needed for such activities. Kolene takes the position that the more people that use the process, the more it will make from the sale of salts and equipment. It says that it is a good

supplier and relies on that effort to get business. About 98 per cent of Kolene's business comes from captive shops.

Heat treaters are independent businesses which offer as a service to anyone the treatment of parts pursuant to Kolene's process. All the heat treaters presently in operation are licensed under the registered servicemark "TUFF-TRIDE" and as a consequence of their licenses they are required to purchase all salts used in the cyanate bath from Kolene. Although they do not have a license under the patent, Kolene has made no claim of patent infringement against these servicemark licensees.

■ Motor City contends that Kolene's patent is unenforceable on the theory that it has misused the patent by requiring heat treaters to purchase their salts from it. The District Court found as a fact that if any tie-in existed, it was between the servicemark "TUFF-TRIDE" and the sale of salts, not the patent and the sale of salts. We hold that this finding is not clearly erroneous.

Motor City urges on appeal, however, that the patent and servicemark are so interrelated that, even accepting the finding of the District Court, there is still patent misuse. This theory presents a novel issue for which we can find no case directly on point.

The patent misuse defense is bottomed on public policy considerations. The defense is not a personal one in the sense that the misuse must be directed at the infringement suit defendant. This point was expressed by the Supreme Court in Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, where, at 494, 62 S.Ct. 402, 406, 86 L.Ed. 363, the Court said:

"It is the adverse effect upon the public interest of a successful infringement suit, in conjunction with the patentee's course of conduct, which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent."

However, as the Court had previously noted at page 493, 62 S.Ct. at page 405:

"Undoubtedly 'equity does not demand that its suitors shall have led blameless lives', Loughran v. Loughran, 292 U.S. 216, 229 [,54 S.Ct. 684, 689, 78 L.Ed. 1219]; cf. Keystone Drilling Co. v. Excavator Co., 290 U.S. 240, 241–45 [,54 S.Ct. 146, 147, 78 L. Ed. 293]; but additional considerations must be taken into account where maintenance of the suit concerns the public interest as well as the private interests of suitors. Where the patent is used as a means of restraining competition with the patentee's sale of an unpatented product, the successful prosecution of an infringement suit even against one who is not a competitor in such sale is a powerful aid to the maintenance of the attempted monopoly of the unpatented article, and is thus a contributing factor in thwarting the public policy underlying the grant of the patent. Maintenance and enlargement of the attempted monopoly of the unpatented article are dependent to some extent upon persuading the public of the validity of the patent, which the infringement suit is intended to establish. Equity may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement, and should do so at least until it is made to appear that the improper practice has been abandoned and that the consequences of the misuse of the patent have been dissipated. Cf. B. B. Chemical Co. v. Ellis, *post*, [314 U.S.] p. 495 [,62 S.Ct. 406, 86 L. Ed. 367]."

■ We know of no authority suggesting that there can be a defense to a patent infringement suit based on "misuse in the air." See Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347 (9th Cir.). The misuse must be of the patent in suit, Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F. 2d 252 (7th Cir.), cert. granted, 364 U. S. 926, 81 S.Ct. 353, 5 L.Ed.2d 265, writ dismissed, 366 U.S. 211, 81 S.Ct. 1091, 6

L.Ed.2d 239; Apex Electrical Mfg. Co. v. Altorfer Bros. Co., 238 F.2d 867 (7th Cir.); Sperry Products Inc. v. Aluminum Co. of America, 171 F.Supp. 901 (N.D.Ohio), rev'd in part on other grounds, 285 F.2d 911 (6th Cir.), cert. denied, Firestone v. Aluminum Co. of America, 368 U.S. 890, 82 S.Ct. 139, 7 L.Ed.2d 87. An antitrust offense does not necessarily amount to misuse merely because it involves patented products or products which are the subject of a patented process. Hazeltime Research, Inc. v. Automatic Radio Mfg. Co., 77 F.Supp. 493, 498 (D.Mass.), aff'd, 176 F.2d 799 (1st Cir.), aff'd, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, rev'd on other grounds, Lear, Inc. v. Adkins, 395 U.S. 653, 671, 89 S.Ct. 1902, 23 L.Ed.2d 610.

As a limit on the misuse doctrine, it can be stated generally that the misconduct must be connected with the matter in litigation, and the defense is not available to a party with whom the misconduct is of no concern, McCullough Tool Co. v. Well Surveys, Inc., 395 F.2d 230, 238 (10th Cir.), cert. denied, 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261.

Applying these principles to the instant case, we find that Motor City has no cause to complain of the alleged misconduct of Kolene. Motor City is not a party to the allegedly illegal contracts, and a realistic analysis does not show that the patent in suit "itself significantly contributes to the practice under attack." *See,* Report of the Attorney General's Committee to Study the Antitrust Laws 251 (1955). This realistic analysis includes considering the fact that 98 per cent of Kolene's business does not involve the alleged misconduct. Moreover, it is only when someone wants to use the process *in connection with Kolene's registered servicemark* (at which time Kolene's reputation goes on the line) that they are required to purchase salts from Kolene. The record shows that Kolene is willing to license its process to heat treaters without the allegedly illegal tie-in but only when the licensee refrains from use of Kolene's servicemark. This offer was made to Motor City in the present case. Neither the right to use the servicemark, *e. g.,* Switzer Bros., Inc. v. Locklin, 297 F.2d 39 (7th Cir.), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 8 L.Ed.2d 9, nor the sale of salts, *e. g.,* Susser v. Carvel Corp., 332 F.2d 505 (2d Cir.), cert. granted 379 U. S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91, cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284, is tied to the right to practice the invention of the patent. Hence, the patent is not a lever used to extend a legal monopoly. *Cf.* Ansul Co. v. Uniroyal, Inc., 306 F.Supp. 541 (S.D. N.Y.).

Affirmed and remanded.