In re: INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGATION.

This Document Applies To:

CSU Holdings, Inc., et al. v. Xerox Corp. (D. Kan. No. 94–2102–EEO)

Civil Action No. MDL–1021.

United States District Court, D. Kansas.

April 8, 1997.

Eric D. Braverman, Employers Reinsurance Corp., Overland Park, KS, P. John Owen, Lori R. Schultz, Morrison & Hecker, Kansas City, MO, Michael C. Manning, Morrison & Hecker, Phoenix, AZ, for CSU Holdings Inc., Copier Services Unlimited, Inc., Copier Services Unlimited of St. Louis, Inc.

James A. Hennefer, San Francisco, CA, Maxwell M. Blecher, Los Angeles, CA, for Acquisition Specialists, Inc., Tecspec, Inc., Consolidated Photo Copy, Inc., Copier Rebuild Center, Inc., CPO Ltd., Creative Copier Services, Inc., Gradwell Co., Inc., Graphic Corp. of Alabama, Intern. Bus. Equip., Inc., Laser Resources Inc., Laser Resources of Minn., Inc., Laser Solutions, Inc., Laser Support and Engineering, Inc., Marathon Copier Services, Inc., Nationwide Technologies, Inc., Reprographics Resources Systems, Inc., Resources Systems, Inc., Suntone Indus., Inc., Technical Duplication Services, Inc., X–Tech

Systems Inc., Xer–Dox Inc., Xerographic Copies Services, Inc.

Peter K. Bleakley, Arnold & Porter, Washington, DC, Peter W. Marshall, Xerox Corp., Stamford, CT, Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS, C. Larry O'Rourke, E. Robert Yoches, Vincent P. Kovalick, Leslie I. Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for Xerox Corp.

### MEMORANDUM AND ORDER

Earl E. O'CONNOR, Senior District Judge.

This matter is before the court on defendant's motion for reconsideration of the order denying summary judgment on copyright infringement (Doc. # 581) and defendant's motion for reconsideration or certification pursuant to 28 U.S.C. § 1292(b) of the order denying summary judgment on patent infringement and antitrust claims (Doc. # 583). After careful consideration of the parties' briefs and evidentiary materials and oral argument on the motions, the court is prepared to rule. For the reasons set forth below, both motions are granted in part and denied in part.

Defendant has included a supplemental statement of facts with its motion for reconsideration of the court's order regarding patent infringement and antitrust claims. Given the additional factual issues raised in the motion, as well as some legal arguments that were not briefed specifically in the previous summary judgment motion, the court will construe defendant's motion as a renewed motion for summary judgment on patent infringement and antitrust claims or in the alternative certification of the court's March 19, 1997, order. The standards relating to summary judgment motions previously were set forth in the court's March 19, 1997, memorandum & order, 964 F.Supp. 1454. The court incorporates that discussion by reference here.

### I. Xerox's Renewed Motion For Summary Judgment On Its Patent Infringement Counterclaim.

#### A. *Factual Background.*

For purposes of this opinion, the following is a brief summary of the material facts that are uncontroverted or deemed admitted, pursuant to Federal Rule of Civil Procedure 56 and District of Kansas Rule 56.1.

This court previously found that CSU infringed Xerox's lawful patents either literally or under the doctrine of equivalents by CSU's use of the 97X0 fuser pressure roll, 97X0(w/ MOD V) fuser heat roll, 97X0(w/o MOD V) fuser heat roll, 1090 family fuser heat roll, 1090 family dicorotron w/ dag coating, 1090 family dicorotron w/o dag coating, and 1065 document handler belt. Mar. 19, 1997, Mem. & Order at 1458.

Xerox seeks damages for CSU's infringement of patents since 1994 when Xerox filed its counterclaim. CSU has submitted an expert report with respect to its antitrust claims which identifies parts overcharge damages for the twenty-six most frequently purchased parts by CSU. Four of the twenty-six parts are among the patented parts at issue in Xerox's motion for summary judgment on its patent infringement counterclaims. From 1993 through 1997, the total overcharge calculated by CSU for these four parts is negative $43,429. The other three patented parts at issue in Xerox's patent infringement counterclaim are not included as part of CSU's damage calculation and CSU has offered no evidence to establish that it was overcharged for these parts.

#### B. *CSU's Patent Misuse Defense.*

##### 1. *Nexus Between Patents At Issue And Misuse.*

To prevail on a defense of patent misuse, an alleged infringer must establish a sufficient nexus between the patent holder's alleged misconduct and the patents at issue in the litigation. *See Riker Laboratories, Inc., v. Gist–Brocades N.V.,* 636 F.2d 772, 777 (D.C.Cir.1980); *Kolene Corp. v. Motor City Metal Treating, Inc.,* 440 F.2d 77, 84–85 (6th Cir.), *cert. denied,* 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971); *McCullough Tool Co. v. Well Surveys, Inc.,* 395 F.2d 230, 238–39 (10th Cir.), *cert. denied,* 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261 (1968). Xerox

has offered additional factual support for its contention that CSU has failed to establish this requisite nexus. This additional evidence is properly considered with respect to Xerox's renewed motion for summary judgment on its patent infringement counterclaims.

■ Xerox sues only for infringement of its patents after it changed its parts policy in 1994 as a result of the *R & D* settlement. CSU claims that Xerox continued to misuse its patents after the R & D settlement by charging exorbitant prices for those products in an effort to eliminate ISO competition in the service market. CSU has failed to come forward with any evidence to substantiate this allegation with respect to the seven patented parts at issue.

As part of its antitrust case, CSU claims parts overcharge damages for only four of the seven patented parts at issue. According to CSU's expert, the total "overcharge" from 1993 through 1997 for these four parts is *negative* $43,429. For two of the four parts, CSU pays less today than it claims is a "reasonable" price. For three of the four parts, CSU paid less than a reasonable price at some point in time between 1993 and 1997. For the remaining part, CSU pays approximately $46 for the part while it claims that the reasonable price is approximately $27. CSU has failed to prove that this price differential is sufficient to constitute misuse. Thus, with respect to the record evidence of the patented parts at issue, CSU actually paid near or less than a reasonable price for the parts.[1]

CSU claims that the omission of the other three patented parts from its damage calculation does not mean that the parts were not priced intentionally by Xerox to exclude competition. Yet, CSU has not offered any evidence of the actual price it paid for the three patented parts not included in its damage calculation.

Xerox is not precluded from recovery on its patent infringement counterclaims based on CSU's general evidence of "misuse in the air." *Kolene,* 440 F.2d at 84. CSU bears the burden of establishing the requisite nexus between the patents at issue and the alleged misuse. Despite two opportunities, CSU has failed to come forward with any evidence to establish that Xerox's pricing of the seven patented parts at issue constitutes misuse. CSU argues that its damage calculation is conservative and that what it characterizes as a "reasonable price from Xerox" is often higher than the prices charged by third parties. CSU simply attempts to blur the fact that it has not offered any evidence that Xerox charged (or CSU paid) exorbitant prices for the seven patented parts at issue. The only record evidence on this point is the report of CSU's expert, which establishes that three of the seven parts are not included in CSU's parts overcharge calculation and that CSU paid less than what it characterizes as a reasonable price for the other four parts combined over the relevant time period. As for Xerox's prices, the evidence establishes that for all infringing parts as a whole, Xerox's prices are on average only 3% higher than the price CSU claims to be reasonable. The court finds that this evidence is insufficient as a matter of law to sustain CSU's patent misuse defense.

The parties have argued in their briefs whether the seven patented parts were included in Xerox's pre–1994 parts policy. To the extent any of the seven patented parts were included in Xerox's prior parts policy and arguably could constitute misuse, such misuse has been purged by the availability of patented parts since 1994 and CSU's ability to purchase the various parts at prices near or below what it characterizes as a "reasonable" price. CSU has failed to establish that Xerox misused its patents under the stan-

---

1. It is immaterial whether CSU purchased these parts at less than a reasonable price from Xerox or third parties. In either case, CSU cannot establish that Xerox's high prices were exclusionary and therefore constitute misuse. In addition, CSU has failed to come forward with specific evidence to establish its suppliers of each of the various patented parts (Xerox or third parties)

and the price it pays for those parts. Even if the court reviewed what Xerox charged for the seven patented parts, rather than what CSU paid, the record evidence establishes that Xerox's prices as a whole were approximately 3% higher than what CSU claims is a reasonable price. This evidence is insufficient as a matter of law to establish patent misuse.

**1484**

dard of misuse that the court articulated in its March 19, 1997, memorandum and order.

Even if CSU could establish the requisite nexus between the patents at issue and the alleged misuse, the court finds below that Xerox's unilateral refusal to sell or license its patented parts (or pricing the products at "unreasonable" prices) cannot constitute misuse. *See infra* part II.

### 2. *Filing Of Infringement Action As Misuse.*

CSU also claims that Xerox's filing of its counterclaims in the instant action constitutes patent misuse. The court previously held that CSU's defense was not precluded as a matter of law because (1) the *Noerr–Pennington*[2] doctrine provides antitrust immunity, not patent or copyright misuse immunity, and (2) evidence of Xerox's intent in prosecuting its infringement counterclaims when viewed together with CSU's other evidence may constitute misuse. Mar. 19, 1997, Mem. & Order at 1462. Based on the parties' supplemental briefing and further consideration of the parties' original briefing, the court finds that the filing of Xerox's patent infringement counterclaims cannot constitute misuse as a matter of law.

■ The patent statute precludes a finding of misuse when the patent holder seeks "to enforce his patent rights against infringement." 35 U.S.C. § 271(d)(3). A finding of misuse is precluded, however, only if the patent infringement suit is brought in good faith. *See Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,* 45 F.3d 1550, 1558–59 (Fed.Cir.1995). As this court noted previously, the Supreme Court has held that an infringement suit is immune from antitrust liability unless the defendant can establish that the suit is objectively baseless. *See Professional Real Estate Investors. Inc. v. Columbia Pictures Indus,. Inc.,* 508 U.S. 49, 56–60, 113 S.Ct. 1920, 1925–28, 123 L.Ed.2d 611 (1993) *("PRE").* In discussing the sham exception under the *Noerr–Pennington* doctrine, the Supreme Court has stated that

the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.

*Id.* at 60, 113 S.Ct. at 1928.

■ CSU effectively concedes that Xerox's patent infringement counterclaims cannot be characterized as objectively baseless. CSU also does not contest that Xerox's filing of its infringement counterclaims alone is insufficient to sustain a finding of misuse. On the other hand, CSU argues that Xerox's subjective intent in bringing its counterclaims is relevant to its misuse defenses. Given the court's finding above that CSU has not established the requisite nexus between the patents at issue and the alleged misuse, the court finds that the filing of Xerox's counterclaims alone is insufficient to support a finding of misuse.

The court finds that there is no principled reason to distinguish the "sham" exception under the *Noerr–Pennington* doctrine from the "bad faith" exception under 35 U.S.C. § 271(d)(3). In *PRE,* the Supreme Court stated that

[w]hether applying *Noerr* as an antitrust doctrine *or invoking it in other contexts,* we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham.

*Id.* at 59, 113 S.Ct. at 1927 (emphasis added); *see Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 743–44, 103 S.Ct. 2161, 2170–71, 76 L.Ed.2d 277 (1983) (analogizing *Noerr's* sham exception to the "improperly motivated" lawsuit standard under the National Labor Relations Act); *Computer Assocs. Int'l. Inc., v. American Fundware, Inc.,* 831 F.Supp. 1516, 1523 (D.Colo.1993)

---

**2.** *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am.* *v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

(the *Noerr–Pennington* doctrine "is a constitutional, not an antitrust, doctrine."). Indeed, the only authority offered by the parties on this point applied an identical analysis to determine whether a lawsuit constituted patent misuse or an antitrust violation. *See Glaverbel*, 45 F.3d at 1558–59.

In addition, the court finds that the same First Amendment principles which protect a patent holder from antitrust violations also should protect a patent holder from assertion of a misuse defense. In either case, a patent holder would be penalized for seeking the protection of the courts which is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). A patent holder's access to the courts therefore is immunized unless his lawsuit is (1) objectively meritless and (2) brought in an attempt to interfere directly with the business of his competitor. *See PRE*, 508 U.S. at 60–61, 113 S.Ct. at 1928–29. As noted above, CSU has not offered any evidence to establish that Xerox's patent infringement counterclaim could be characterized as objectively meritless. Indeed, the court has granted summary judgment in favor of Xerox on this claim. A finding of misuse based on the filing of Xerox's patent infringement counterclaim therefore is precluded as a matter of law.

The court previously did not resolve the issues of willfulness, estoppel, laches, and statute of limitations based on the court's finding that CSU's misuse defense could not be precluded as a matter of law. The court now will address those issues.

## C. *Willfulness Of CSU's Infringement.*

Xerox claims that CSU's infringement was willful because CSU had actual notice of Xerox's patent rights yet failed to exercise its affirmative duty of due care. *See Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1428 (Fed.Cir.1988) (citation omitted). "The test [of due care] is whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Id.* The duty of due care "normally requires that a potential infringer obtain competent legal advice before infringing or continuing to infringe." *Id.* The failure to obtain legal advice, however, is not determinative and constitutes only one factor in the willfulness determination. *Id.*

CSU contends that it "consult[ed] with its antitrust counsel and, based on their advice, has asserted a misuse defense in good faith." Xerox, relying on *Lightwave Technologies, Inc. v. Corning Glass Works*, 19 U.S.P.Q.2d 1838 (S.D.N.Y.1991), argues that CSU has failed to meet the requirements of due care as a matter of law. In *Lightwave*, the accused infringer obtained an opinion from its antitrust counsel that it had a "submissible antitrust case against Corning, and that a verdict for Lightwave on its antitrust claims would render the patent unenforceable." *Id.* at 1847. The jury found that the defendant had willfully infringed plaintiff's patents. The court refused to overturn the jury verdict, finding that "[g]iven the complexity of antitrust law, having a 'submissible antitrust case' is hardly a sound basis for proceeding with patent infringing activities." *Id.* at 1847–48. "[C]onclusory oral opinions do not discharge the duty of care." *Id.* at 1848. The court in *Lightwave* also found significant the fact that the accused infringer never articulated in clear, specific, and concrete terms its patent misuse claims and did not even raise the issue until the conclusion of the antitrust phase of trial. *Id.*

In this case, CSU timely raised the misuse defense and certainly articulated its misuse defense in response to Xerox's motion for summary judgment. In addition, the court is not aware of any case that requires an alleged infringer to receive advice from patent counsel, as opposed to antitrust counsel, in order to maintain a misuse defense in good faith. In fact, the misuse defense asserted in this case by CSU was based on an alleged antitrust violation. Therefore, antitrust counsel's advice was pertinent. Although counsel may not have predicted perfectly which patents Xerox would choose to enforce and whether the court ultimately would sustain the misuse defense, counsel's

advice was sufficient to raise an issue of fact as to whether CSU had a reasonable belief that it may not be liable to Xerox for patent infringement. The court accordingly denies Xerox's motion for summary judgment on the willfulness issue.

### D. *Estoppel.*

 To establish estoppel in the patent infringement context, the alleged infringer must establish that (1) the patent owner, through conduct, positive statement, or misleading silence, represented to the infringer that its business would be unmolested by claims of infringement, (2) the alleged infringer relied on this communication, and (3) the infringer would be materially prejudiced if the patent owner is allowed to proceed with its infringement action. *See ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed.Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 211 (1995); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041–43 (Fed.Cir. 1992); *Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed.Cir.1990). CSU contends that (1) Xerox has known since 1987 that CSU was obtaining parts from sources other than Xerox, (2) Xerox never indicated to CSU that Xerox believed CSU was infringing on its valid patents, and (3) CSU expanded into other cities before Xerox filed its counterclaims in reliance on Xerox's silence. Xerox does not dispute any of these facts for purposes of the instant motion.

 The first element of estoppel applicable to this case involves the patent owner's "misleading silence." CSU points only to Xerox's silence without explaining how Xerox's silence was misleading. The Federal Circuit has held that "[s]ilence alone is not sufficient affirmative conduct to give rise to estoppel." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed.Cir.1992) (citations omitted). Rather, estoppel can be established by silence only if other factors are present. *See ABB Robotics*, 52 F.3d at 1064 ("Misleading action by the patentee may be silence, if such silence is accompanied by some other factor indicating that the silence was sufficiently misleading to amount to bad faith."); *A.C.*

*Aukerman*, 960 F.2d at 1042 ("plaintiff's inaction must be combined with other facts respecting the relationship or contracts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned"). For example, a patent owner's silence may support an estoppel defense when the patent owner specifically objects to the alleged infringer's activities, but then remains silent for a long period of time before filing an infringement action. *See Meyers*, 974 F.2d at 1308–09; *A.C. Aukerman*, 960 F.2d at 1042. CSU has failed to show any alleged misconduct by Xerox besides its silence and, therefore, CSU's defense of estoppel cannot be supported.

 CSU also cannot establish the second element of its defense, *i.e.*, that it relied on Xerox's silence. An infringer cannot assert reliance on the patent owner's silence if the infringer did not even know of the potential patent problem. *See A.C. Aukerman*, 960 F.2d at 1042–43. CSU cannot claim that it relied on Xerox's silence regarding the seven patents at issue when CSU has not presented any evidence that it was aware of the patents and the potential infringement.

Finally, CSU has not established that it would be materially prejudiced by allowing Xerox to proceed because CSU has not shown that it took any actions in reliance on Xerox's silence. CSU claims without any evidentiary support that it expanded to two cities from 1987 through 1994 based on Xerox's silence. After Xerox filed its counterclaims in November 1994, CSU expanded to four cities in 1995 and one city so far in 1997. In light of CSU's expansion after Xerox filed its infringement counterclaims, CSU bears the burden of establishing that it would have altered its pre-November 1994 expansion if Xerox would have sued earlier. *See Meyers*, 974 F.2d at 1309. CSU has offered no evidence on this point. The record evidence suggests that CSU continued its expansion plans despite Xerox's filing of its infringement counterclaims. The court accordingly finds that CSU has presented insufficient evidence to establish that it took any actions in reliance on Xerox's silence. For each of the above reasons, the court grants summary

judgment in favor of Xerox on CSU's estoppel defense.

E. *Laches.*

[redacted] A successful laches defense bars damages only for conduct occurring prior to the filing of the lawsuit. *See Adelberg,* 921 F.2d at 1270 ("defense of laches bars the recovery of damages for any patent infringement occurring prior to the filing of the lawsuit"); *A.C. Aukerman,* 960 F.2d at 1041 ("laches bars damages for a patent defendant's pre-filing infringement but not for post-filing damages or injunctive relief"); *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 741 (Fed.Cir.1984) (laches has "no effect on an action for post-filing damages or an injunction"). CSU contends that the laches doctrine is a defense to all damages and injunctive relief except for post-filing injunctive relief. Neither authority cited by CSU supports the proposition that post-filing damages are precluded by a successful laches defense. *See Union Shipbuilding Co. v. Boston Iron & Metal Co.,* 17 F.Supp. 318 (D.Md.), *aff'd,* 93 F.3d 781 (4th Cir.1996); *Rajah Auto Supply Co. v. Belvidere Screw & Machine Co.,* 275 F. 761, 764 (7th Cir.1921). In this case, Xerox seeks only damages accruing after the filing of its patent infringement counterclaims. Thus, CSU's defense of laches fails as a matter of law.

F. *Statute Of Limitations.*

[redacted] Xerox originally moved for summary judgment on CSU's statute of limitations defense to Xerox's patent infringement counterclaims. CSU did not respond to Xerox's contentions. Xerox seeks only prospective relief for its patent infringement counterclaims and, therefore, the statute of limitations is not a bar to its claims. CSU's statute of limitations defense is invalid as a matter of law.

For the above reasons, the court grants summary judgment in favor of Xerox on its patent infringement counterclaim with respect to the seven parts identified in the court's March 19, 1997, memorandum and order. The only remaining issues on Xerox's patent infringement counterclaim, with respect to the seven patented parts previously referenced, are whether CSU willfully infringed Xerox's patents and the amount of damages.

## II. Xerox's Renewed Motion For Summary Judgment On CSU's Antitrust Claims.

[redacted] To establish monopolization under section 2 of the Sherman Act, CSU must prove that (1) Xerox possessed monopoly power in the relevant market and (2) Xerox willfully acquired or maintained that monopoly power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 480, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992) (*"Kodak"*) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). For purposes of this motion only, Xerox does not contest that it has monopoly power in the relevant parts and service markets. The disputed issues arise over whether Xerox's actions satisfy the conduct element of a section 2 claim. In particular, Xerox challenges the court's previous rulings that an antitrust claim may be based on (1) Xerox's refusal to sell patented products and (2) Xerox's pricing strategies relating to its patented products.[3]

A. *Refusal To Sell Patented Products As An Antitrust Violation.*

[redacted] Xerox requests reconsideration or certification of the court's ruling that Xerox's refusal to sell its patented products may constitute an antitrust violation. This court in effect defined the scope of a patent holder's right to license or use its invention by the relevant antitrust market. This court's previously announced rule would limit a patent holder from using its patent to lawfully acquire a monopoly in more than one antitrust market. The court's ruling was based on CSU's evidence that Xerox leveraged its

3. The court notes that CSU's misuse and antitrust allegations regarding Xerox's refusal to sell and high pricing of its patented parts are based on the legal theory prohibiting monopoly leveraging. *Kodak,* 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29.

monopoly power in the parts market to maintain or acquire its monopoly in the service market. Although CSU may have sufficient other evidence to support such a leveraging theory, the court finds now that Xerox's unilateral refusal to sell or license its patented parts cannot constitute patent misuse or unlawful exclusionary conduct under the antitrust laws.

 The patent statute allows a patent holder to exclude others from manufacturing, selling, or using his inventions. 35 U.S.C. § 154. The patent statute also provides that "[n]o patent owner otherwise entitled to relief for infringement ... of a patent shall be denied relief or deemed guilty of misuse *or illegal extension of the patent right* by reason of his ... refus[al] to license or use any rights to the patent." 35 U.S.C. § 271(d)(4) (emphasis added). "The heart of (the patentee's) legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent." *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1206 (2d Cir.1981) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 135, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1969)), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982); *see United States v. Westinghouse Elec. Corp.,* 648 F.2d 642, 647 (9th Cir.1981) (right to exclude others is the essence of the patent monopoly). Of course, a patent holder cannot use his patent to justify anticompetitive conduct beyond the limit or scope of the patent grant. *See Zenith,* 395 U.S. at 136, 89 S.Ct. at 1583 ("But there are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee."); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 230, 84 S.Ct. 784, 788, 11 L.Ed.2d 661 (1964) ("[T]he patent monopoly may not be used in disregard of the antitrust laws."). For example, a patent holder generally cannot grant licenses on the condition that royalties are paid on unpatented products. *See, e.g., Zenith,* 395 U.S. at 135, 89 S.Ct. at 1583.

 There is no prohibition, however, from lawfully using a patent to acquire a monopoly in more than one relevant antitrust market. In other words, a single "patent monopoly" can be used to secure multiple "economic monopolies," *i.e.,* monopolies in more than one relevant antitrust market. *See Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 221, 100 S.Ct. 2601, 2626, 65 L.Ed.2d 696 (1980) ("[T]he boundary of a patent monopoly is to be limited by the literal scope of the patent claims."); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1367 (Fed.Cir.) ("The patent system, which antedated the Sherman Act by a century, is not an 'exception' to the antitrust laws, and patent rights are not legal monopolies in the antitrust sense of that word."), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). If the court held otherwise, then a patent holder rarely could refuse to license his product without fear that he had not properly defined the relevant antitrust market or considered how the relevant market may be defined in the future. For example, if Xerox obtained a patent for a part that could be used in either a copier or a printer, and a jury determined that there were separate antitrust markets for copiers and printers, then Xerox could refuse to license its product in only one of the relevant antitrust markets.[4] We do not think Congress intended such limited patent protection or to require such perfect foresight by the patent holder in defining the relevant antitrust markets. A patent holder's rights should not fluctuate from day to day based on the changing relevant market definitions. Indeed, several courts have held that "where a patent has been lawfully acquired, subsequent conduct permissible under the patent

---

4. In addition, difficulties could arise if the relevant market definitions change over time. For example, the relevant market may include both parts and service at the time a patent holder researches and creates an invention for a copier part. A patent holder certainly would undertake his research with the expectation that he could exclude others from use of the invention in the relevant market which includes parts and service. If the relevant market changed after the patent holder marketed his invention so that parts and service became separate markets, then the patent holder's right to exclude would be severely diminished. In fact, the patent holder's right to exclude would be practically meaningless if the patent holder wanted to continue to compete in both markets.

laws cannot trigger any liability under the antitrust laws." *SCM*, 645 F.2d at 1206; *see Miller Insituform, Inc. v. Insituform of North Am., Inc.*, 830 F.2d 606, 609 (6th Cir. 1987), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1023, 98 L.Ed.2d 988 (1988); *Servicetrends, Inc. v. Siemens Medical Sys., Inc.*, 870 F.Supp. 1042, 1056 (N.D.Ga.1994); *see also Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L.Ed.2d 98 (1964) ("The patent laws which give a 17-year monopoly on 'making, using or selling the invention' are in *pari materia* with the antitrust laws and modify them *pro tanto.*"); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir.1994) (recognizing, as part of copyright analysis, that section 271 of the patent statute may preclude all antitrust claims and counterclaims premised on a refusal to license a patent). Thus, a patent holder "retains the power to exclude others from manufacturing, using, and selling his inventions without running afoul of the antitrust laws." *Miller*, 830 F.2d at 609; *see SCM*, 645 F.2d at 1209.

CSU argues that a patent holder's unilateral refusal to sell is not legal when the patent holder exercises this right to extend its monopoly into another relevant antitrust market. Although a patent holder perhaps extends his "economic power" by this conduct, he has not expanded the scope of the patented "invention." [5] Indeed, the patent statute states that the unilateral refusal to license or use a patent shall not constitute misuse and shall not be deemed an "illegal extension of the patent right." 35 U.S.C. § 271(d)(4). The fact that Xerox has attempted to secure the full benefit of its "patent monopoly" by entering more than one market does not raise any antitrust concerns which have not already been considered and balanced by Congress in enacting the patent statute.[6] The Sixth Circuit has rejected the

theory that a patent holder cannot realize the full value of its invention by entering more than one relevant antitrust market. *See Miller, supra.* The Sixth Circuit stated that

[a]pparently, appellants' point is that assuming both the position of licensor and of competitor with its licensees renders INA potentially liable for antitrust violations. INA has recognized this theory of appellants as charging "vertical integration," but persuasively argues that this theory is inapplicable to a patent monopolist. We agree. There is no adverse effect on competition since, as a patent monopolist, INA, from the start, had exclusive right to manufacture, use, and sell his invention.

*Miller*, 830 F.2d at 609; *see Servicetrends*, 870 F.Supp. at 1056 ("Although the Court need not decide the issue here, it appears that defendant is entitled to a so-called monopoly in the repair of its shocktube replacement part—a monopoly power that is inherent in its right to sell or refuse to sell the patented components."), *amended on reconsideration*, 1994 WL 776878 (N.D.Ga. Jun.24, 1994) (finding as a factual matter that the individual component parts of the shocktube were not patented).

CSU's reliance (and this court's previous reliance) on the Supreme Court's statement in *Kodak* is misplaced. In *Kodak*, the Court stated that it "has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to [antitrust] liability if 'a seller exploits his dominant position in one market to expand his empire into the next [market].'" *Kodak*, 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611, 73 S.Ct. 872, 881–82, 97 L.Ed. 1277 (1953)). The Court's statement simply is not applicable where a patent holder, exer-

---

**5.** As Xerox correctly notes, "[n]o patent states that it confers a monopoly in any relevant [antitrust] market. A patent only defines the invention. Because each use of that invention may be prevented by [the patent holder], the patent may have some anticompetitive effect in each market in which it is used [or not used]."

**6.** Courts also have struck the same balance between the patent and antitrust laws. *See, e.g., SCM*, 645 F.2d at 1205–06. Under CSU's inter-

pretation of *Kodak*, inventors would have very little incentive to develop products useful in more than one relevant antitrust market because they could not exclude competitors in more than one market (assuming the patent holder competes in both markets). To preclude patent holders from realizing the full value of their inventions by unilaterally excluding others seems to stand the patent law on its head.

cising his unilateral right to refuse to license or use his invention, acquires a monopoly in two separate relevant antitrust markets. There is no unlawful leveraging of monopoly power when a patent holder merely exercises its rights inherent in the patent grant. In other words, Xerox did not exploit its *dominant position* in the parts market to obtain a monopoly in the service market. Rather, Xerox exploited its lawful *patent* to obtain a monopoly in both the parts and service markets. Xerox's power and right to exclude ISOs from the service market arose from its *patented invention*, not from its *position* in the parts market.

This court finds the Supreme Court's statement in *Kodak* inapplicable for other reasons as well. First, Kodak's refusal to sell patented parts was not at issue in the decision. The Supreme Court referred to patents only once to illustrate a method of lawfully acquiring monopoly power. We find nothing in *Kodak* which addresses the issue of whether a single patent can give its holder a monopoly in more than one antitrust market. Second, the statement in *Kodak*, as evidenced by the cases cited by the Court, applied to concerted and contractual activity and was in the context of a tying claim. *See Data General*, 36 F.3d at 1185–86 n. 63 (citing footnote 29 of *Kodak* for the proposition that concerted or contractual behavior is prohibited and not even referring to the same footnote when addressing whether a copyright holder's unilateral refusal to sell its copyrighted products is lawful). In contrast, Xerox has unilaterally refused to sell its patented parts.[7]

CSU complains primarily because Xerox achieved too much success by exercising its rights inherent in the patent grant. Of course, a patent holder can continue "to exercise his patent's exclusionary power even after achieving commercial success; to allow the imposition of treble damages based on

what a reviewing court might later consider, with the benefit of hindsight, to be too much success would seriously threaten the integrity of the patent system." *SCM*, 645 F.2d at 1206. The court believes that the result should be no different whether a patent holder's success (achieved by conduct expressly sanctioned by the patent statute) impacts one or more relevant antitrust markets. *See Miller*, 830 F.2d at 609.

For the above reasons, the court grants partial summary judgment in favor of Xerox on CSU's antitrust claims. Xerox's unilateral refusal to sell or license its patented parts cannot give rise to antitrust liability. The court's ruling does not preclude a finding of antitrust liability against Xerox based on CSU's other allegations of exclusionary conduct.[8]

**B. *Pricing Of Products As An Antitrust Violation.***

■■■ Xerox also seeks reconsideration or certification of the court's ruling that Xerox's pricing of its patented products at an unreasonably high price or in a discriminatory manner can constitute an antitrust violation. The court essentially has resolved the first issue by finding that Xerox's exercise of its unilateral right to refuse to sell or license its patented products cannot constitute an antitrust violation. A demand for a price which is "so high as to preclude acceptance of a license offer is, after all, not appreciably different from a refusal to license upon any terms." *W.L. Gore & Assocs. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir.1976). Thus, if Xerox could lawfully refuse to sell its patented parts, it certainly could price its parts at a price as high as it sees fit. *See Brulotte v. Thys Co.*, 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964) ("A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly.").

---

7. CSU also fails to explain why the court should assume that Xerox's monopoly over the parts market was created first and then used as leverage to gain a monopoly over the service market. It appears that Xerox's monopoly in both markets may have been created simultaneously. In any event, it was Xerox's refusal to license its patented parts that created both monopolies.

8. Among these other allegations, CSU claims that Xerox refused to sell unpatented parts to ISOs, implemented burdensome procedures for customers ordering parts, threatened to impose enormous costs for customers switching service between ISOs and Xerox, and cut service prices in an effort to eliminate ISO competition.

■ CSU also claims that Xerox charged higher prices to self-servicers (customers who self service their copiers and printers) than ISOs. Of course, inherent in Xerox's patent grant is the right to license its product to some and not to others. *Westinghouse*, 648 F.2d at 647 ("The right to license that patent, exclusively or otherwise, or to refuse to license at all is 'the untrammeled right' of the patentee.") (citation omitted). Thus, Xerox has the right to price its patented products at different prices to different customers. *See USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 512–13 (7th Cir. 1982) (criticizing shrimp peeler cases and finding that "there is no antitrust prohibition against a patent owner's using price discrimination to maximize his income from the patent"), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983); *Westinghouse*, 648 F.2d at 647. CSU has not pointed to any authority holding that a patent holder cannot charge different prices to customers for a patented product.[9]

For the above reasons, the court finds that Xerox's pricing of its patented parts cannot constitute exclusionary conduct under the antitrust laws.

### III. Xerox's Motion For Reconsideration Of The Court's Copyright Summary Judgment Order.

■ Xerox seeks reconsideration of this court's order denying Xerox summary judgment on its copyright infringement counterclaims. Xerox claims that CSU has not provided any evidence to establish any misuse by Xerox pertaining to its copyrighted manuals. Although Xerox previously did not distinguish plaintiff's evidence regarding diagnostic software from manuals, the court finds no record evidence establishing that Xerox charged an unreasonable or even a high price for its operator and service manuals after Xerox resumed sale of its manuals in 1994. Of course, CSU has presented evidence that Xerox refused to sell operator and service manuals prior to April 1994.

■ The same principles under the *Noerr–Pennington* doctrine discussed earlier apply equally to CSU's claim that the filing of Xerox's copyright infringement counterclaims constitutes misuse. CSU has failed to establish that Xerox's counterclaims are objectively meritless. The court issued a preliminary injunction with respect to these copyright claims and has granted summary judgment in favor of Xerox on a large portion of its claims. CSU, therefore, is barred from asserting that the filing of Xerox's copyright infringement counterclaims can constitute misuse.

For the above reasons, the court grants summary judgment in favor of Xerox on CSU's misuse defense with respect to copyrighted manuals for the time period after April 1994.[10]

IT IS THEREFORE ORDERED that defendant's motion for reconsideration of the order denying summary judgment on copyright infringement (Doc. 1581) is granted in part and denied in part as discussed above.

IT IS FURTHER ORDERED that defendant's motion for reconsideration or certification pursuant to 28 U.S.C. § 1292(b) of the order denying summary judgment on patent infringement and antitrust claims (Doc. # 583) is granted in part and denied in part.

---

9. Even if price discrimination by a patent holder could be illegal under the antitrust laws, the court doubts that the evidence presented by CSU in opposition to Xerox's summary judgment motion is sufficient. CSU's only evidence of price discrimination is a contract between the Navy and Xerox which does not appear to be comparable to a contract between CSU and Xerox. In addition, the *R & D* settlement specifically prohibited Xerox from charging its self-servicers a lower price than ISOs.

10. CSU filed a motion for discovery sanctions against Xerox on March 13, 1997. CSU claims that Xerox should be estopped from denying CSU's laches and statute of limitations defenses because of Xerox's discovery conduct. The court accordingly will defer consideration of the merits of these defenses until CSU's pending motion for sanctions is decided.